No. 24-2991

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

---

ANDRE BOYER et al.,

Appellant,

v.

CITY OF PHILADELPHIA et al.,

Appellees

---

**CORRECTED OPENING BRIEF OF APPELLANTS ANDRE BOYER
AND PENNSYLVANIA S.I.T.E.S. AGENTS, LLC**

---

**CORNERSTONE LAW FIRM, LLC**
Joel A. Ready, Esquire
Attorney ID No. 321966
8500 Allentown Pike, Ste 3
Blandon, PA 19510
P (610) 926-7875
F (484) 930-0054
joel@cornerstonelaw.us

# TABLE OF CONTENTS

TABLE OF CITATIONS ........................................................................... iv

I.     JURISDICTIONAL STATEMENT. ..........................................................1

II.    ISSUES PRESENTED. ..............................................................................1

III.   STATEMENT OF RELATED CASES. ....................................................1

IV.   STATEMENT OF THE CASE. ................................................................2

A.    *Over the Course of a Decade, the Philadelphia Police Department, District Attorney's Office, Sheriff, and Others Retaliate against Andre Boyer, a Former Police Officer, by Revoking His Uniform Firearms Act License, Opposing His Applications for a Private Detective License, and Prosecuting Him for Openly Wearing a Firearm in the City for Self-Defense and Employment-Purposes.* ....................................................................................2

B.    *Procedural Posture* ..........................................................................8

V.    SUMMARY OF ARGUMENT .................................................................14

VI.   STANDARD OF REVIEW .......................................................................17

VII.  ARGUMENT ............................................................................................17

A.    *Wanda Newsome and the City of Philadelphia Violated and Continue to Violate Boyer's Second Amendment Rights by Denying His Application for a Uniform Firearms Act License based on Discriminatory rather than Objective Criteria under the Bruen Test and Which Have No Support in America's History of Firearms Regulation.* ...................................................19

    1. Subjective Assessments of Character, Reputation, and Dangerousness. .....24

    2. Acquittals or Arrests without Conviction. ................................................37

    3. "Good Cause" as Open-Ended Discretion for Granting and Revoking a License within a Star Chamber. ...............................................................40

    4. Qualified Immunity is Not an Option and *Monell* Liability is Demonstrated. 45

B.    *Appellees Violated and Continue to Violate the Second Amendment and the*

*Equal Protection Clause by Enforcing a Categorical Ban on Open-Carry of Firearms in Philadelphia and by Discriminating against Persons, like Boyer, Who Possess a Lethal Weapons Act Certification for Employment-Purposes*.......................................................................47

   1. Facial Challenge to 18 Pa.C.S. §§ 6106(a)(1) and 6108...........................49
   2. As-Applied Challenge to 18 Pa.C.S. § 6108................................................53
   3. Failure to Promptly Return Firearms, Ammunition, and Property When Criminal Charges Terminated in Favor of Andre Boyer. ...........................61

C.   *Appellees Violated and Continue to Violate the Second and Fourth Amendments by Arresting Boyer and Seizing His Firearms without Probable Cause Regarding Exemption from Licensure.*...............................................62

   1. A Plausible Claim is Stated. .....................................................................62
   2. Qualified Immunity is Not an Option and Appellees are Estopped from Asserting It. ..............................................................................................67
   3. Statute of Limitations is Not a Defense. ...................................................69

D.   *Appellees Violated and Continue to Violate Boyer's Second Amendment Right to Carry a Firearm to and from Courthouses and to Secure His Firearm within a Gun Locker while inside Courthouses.* ..........................70

E.   *Appellees Violated and Continue to Violate Appellants' Due Process Rights by Depriving Them of Licensure under the Uniform Firearms Act and Private Detective Act without the Benefit of a Jury Trial.* ..........................73

F.   *Appellants have Standing to Raise Constitutional Challenges to the Private Detective Act on Its Face or As-Applied to the Facts.* .................................83

   1. The Patrolman Exception and the Application of Collateral Estoppel. .......84
   2. Lack of Fair Warning. ................................................................................88

G.   *The District Court Erred in Dismissing Philadelphia Lodge No. 5, Fraternal Order of Police, "With Prejudice."* ............................................................93

H.   *The Balance of Appellees' Boilerplate Affirmative Defenses Should have been Denied.* ..............................................................................................95

**VIII. CONCLUSION AND RELIEF REQUESTED.........................................97**

iii

# TABLE OF CITATIONS

**Cases**

Abbas v. Dixon, 480 F.3d 636 (2d Cir. 2007)    94

Abbott v. Pastides, 900 F.3d 160 (4th Cir. 2018)    56

Adarand Constructors v. Pena, 515 U.S. 200 (1995)    48

Allen v. Tooley, 80 Eng. Rep. 1055 (K.B. 1614)    80

Almario-Kalaw v. INS, 133 F.3d 1147 (9th Cir. 1997)    25

Americans for Prosperity Found. v. Bonta, 594 U.S. 595 (2021)    56

Commonwealth v. Anderson, 169 A.3d 1092 (Pa.Super. 2017)    59

Antonyuk v. Chiumento (*Antonyuk I*), 89 F.4th 271 (2d Cir. 2023)    31

Antonyuk v. James (*Antonyuk II*), 120 F.4th 941 (2d Cir. 2024) (en banc)    31, 36

Apprendi v. New Jersey, 530 U.S. 466 (2000)    39

Aquilino v. City of Philadelphia, 884 A.2d 1269 (Pa.Super. 2005)    93-94

Ashcroft v. Iqbal, 556 U.S. 662 (2009)    17

Axon Enters. v. FTC, 598 U.S. 175 (2023)    74, 76

Aymette v. State, 21 Tenn. 154 (1840)    34 n.6

B. Sanfield, Inc. v. Finlay Fine Jewelry Corp., 168 F.3d 967 (7th Cir. 1999)    18

Bartholet v. Reishauer A.G., 953 F.2d 1073 (7th Cir. 1992)    18

Berg v. County of Allegheny, 219 F.3d 261 (3d Cir. 2000)    62

Commonwealth v. Biever, 283 A.3d 866 (Pa.Super. 2022)    49

Commonwealth v. Bigelow, 399 A.2d 392 (Pa. 1979)    55, 63

Bd. of License & Inspection Rev. v. Mirowitz, 520 A.2d 558 (Pa. Commw. Ct. 1987)    42

Boettger v. Miklich, 599 A.2d 713 (Pa. Commw. Ct. 1991)    97

Borelli v. City of Reading, 532 F.2d 950 (3d Cir. 1976)    1

Bliss v. Commonwealth, 12 Ky. 90 (1822)    33

Bowman v. Middleton, 1 S.C.L. (1 Bay) 252 (1792)    77 n.13

Bown v. Borough of Mahaffey, 35 F.3d 846 (3d Cir. 1994)    48

Caba v. Weaknecht, 64 A.3d 39 (Pa. Commw. Ct. 2013)     26

Cantwell v. Connecticut, 310 U.S. 296 (1940)     Passim

State v. Cantwell, 8 A.2d 533 (Conn. 1939)     58 n.9

Carter v. City of Philadelphia, 181 F.3d 339 (3d Cir. 1999)     18

State v. Chandler, 5 La. Ann. 489 (1850)     34 n.6

Chaloux v. Killeen, 996 F.2d 246 (9th Cir. 1989)     46

Chesman ex ux. v. Nainby, 93 Eng. Rep. 819 (1727)     80

Citizens United v. FEC, 558 U.S. 310 (2010)     19

Cook County v. Wolf, 962 F.3d 208 (7th Cir. 2020)     56-57

Connelly v. Lane Constr. Corp., 809 F.3d 780 (3d Cir. 2016)     17

Copenhaver v. Borough of Bernville, 2003 U.S. Dist. LEXIS 1315 (E.D. Pa. Jan. 9, 2003)     95

Craigmiles v. Giles, 312 F.3d 220 (6th Cir. 2002)     87

Crawford v. Washington, 541 U.S. 36 (2004)     74

Delaware v. Prouse, 440 U.S. 648 (1979)     Passim

Dent v. West Virginia, 129 U.S. 114 (1889)     83

DiSalvio v. Lower Merion Sch. Dist., 158 F. Supp. 2d 553 (E.D. Pa. 2001)     95

District of Columbia v. Heller, 554 U.S. 570 (2008)     Passim

Dobbs v. Jackson Women's Health Organization, 597 U.S. 215 (2022)     74

Doe v. Bd. of Prob. & Parole, 513 F.3d 95 (3d Cir. 2008)     84

Doe v. Delie, 257 F.3d 309 (3d Cir. 2001)     69

*In re* Dorsey, 7 Port. 293 (Ala. 1838)     Passim

Dorsey v. Redman, 96 A.3d 332 (Pa. 2014)     97

E.B. v. Verniero, 119 F.3d 1077 (3d Cir. 1997)     25

Fine v. Checcio, 870 A.2d 850 (Pa. 2005)     93

Free Speech Coalition, Inc. v. U.S. Attorney General, 975 F.3d 408 (3d Cir. 2020)     56

Frein v. Pennsylvania State Police, 47 F.4th 247 (3d Cir. 2022)     15, 61

G-I Holdings, Inc. v. Reliance Ins., 586 F.3d 247 (3d Cir. 2009)     68

Garcia v. Chiquita Brands Int'l, Inc., 48 F.4th 1202 (11th Cir. 2022)    93

Gordon v. Degelmann, 29 F.3d 295 (7th Cir. 1994)    62

Green Party of Tennessee v. Hargett, 791 F.3d 684 (6th Cir. 2015)    19

Greenberg v. Lehocky, 81 F.4th 376 (3d Cir. 2023)    69

Greene v. McElroy, 360 U.S. 474 (1959)    48

Griffin v. Maryland, 378 U.S. 130 (1964)    62

Hankin Family P'ship v. Upper Merion Township, 2012 U.S. Dist. LEXIS 1471 (E.D. Pa. Jan. 5, 2012)    69

Harris v. Sheriff of Delaware County, 675 A.2d 400 (Pa. Commw. Ct. 1996)    25, 41

Hayes v. Long, 72 F.3d 70 (8th Cir. 1995)    68

Hayes v. City of Philadelphia, 2005 U.S. Dist. LEXIS 27916 (E.D. Pa. Nov. 14, 2005)    95

Commonwealth v. Hicks, 208 A.3d 916 (Pa. 2019)    Passim

Hill v. Borough of Kutztown, 455 F.3d 225 (3d Cir. 2006)    45

Ivani Contracting Corp. v. City of New York, 103 F.2d 257 (2d Cir. 1997)    69

Commonwealth v. Jackson, 302 A.3d 737 (Pa. 2023)    65

State v. Johnston, 2 H. & McH. 160 (1786)    80

Kilbourn v. Thompson, 103 U.S. 168 (1880)    62

Koons v. Platkin, 673 F. Supp. 3d 515 (D. N.J. 2023)    52, 72

Kost v. Kozakiewicz, 1 F.3d 176 (3d Cir. 1993)    18

Kremer v. Chemical Construction Corp., 456 U.S. 461 (1982)    88

Laird v. Tatum, 408 U.S. 1 (1972)    56

Lara v. Commissioner, 125 F.4th 428 (3d Cir. 2025)    Passim

Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163 (1993)    18

Lindsay v. Commissioners, 2 S.C.L. (2 Bay) 38 (1796)    77 n.13

Commonwealth v. Livingston, 2024 Pa. Super. Unpub. LEXIS 3142 (Dec. 17, 2024)    37-38

Commonwealth v. Lopez, 565 A.2d 437 (Pa. 1989) ......... 55, 63

Lovering v. Dettre, 41 Pa. D. & C. 716 (C.P. Montgomery 1941) ......... 41

Commonwealth v. Malloy, 257 A.3d 142 (Pa.Super. 2021) ......... 65

Manuel v. City of Joliet, 580 U.S. 357 (2017) ......... 93

Marchionni v. SEPTA, 2000 U.S. Dist. LEXIS 814 (E.D. Pa. Feb. 2, 2000) ......... 69

Marcus v. Search Warrant of Property, 367 U.S. 717 (1961) ......... 75

McBride v. Int'l Longshoremen Ass'n, 778 F.3d 453 (3d Cir. 2015) ......... 98

McDonald v. City of Chicago, 561 U.S. 742 (2010) ......... Passim

McGreevy v. Stroup, 413 F.3d 359 (3d Cir. 2005) ......... 46

Meyer v. Nebraska, 262 U.S. 390 (1923) ......... 84, 88

State v. Mitchell, 3 Blackf. 229 (Ind. 1833) ......... 35

Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978) ......... 45

Morrison v. Fox, 660 F.2d 87 (3d Cir. 1981) ......... 45

New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022) ......... Passim

Nixon v. Dep't of Pub. Welfare, 839 A.2d 277 (Pa. 2003) ......... 88

Nunn v. State, 1 Ga. 243 (1846) ......... Passim

State ex. rel. Oklahoma State Bureau of Investigation v. Warren, 975 P.2d 900 (Okla. 1998) ......... 39

Pinsky v. Duncan, 79 F.3d 306 (2d Cir. 1996) ......... 46

Plyler v. Doe, 457 U.S. 202 (1982) ......... 49, 91

Range v. U.S. Attorney General (*Range I*), 69 F.4th 96 (3d Cir. 2023) ......... 47

Range v. U.S. Attorney General (*Range II*), 124 F.4th 218 (3d Cir. 2024) (en banc) ......... Passim

Renk v. City of Pittsburgh, 641 A.2d 289 (Pa. 1994) ......... 95

Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990) ......... 56

Schlichter v. Limerick Township, 2005 U.S. Dist. LEXIS 7287 (E.D. Pa. Apr. 26, 2005) ......... 96

Schware v. Bd. of Bar Examiners, 353 U.S. 232 (1957) ......... 83, 87

*In re* Sentry Secur., Inc., 417 A.2d 190 (Pa. 1980) ......... 85

Shane v. Fauver, 213 F.3d 113 (3d Cir. 2000)                                    93

Siegel v. Platkin, 653 F. Supp. 3d 136 (D. N.J. 2023)                           22

Skipworth ex rel. Williams v. Lead Indus. Ass'n, 690 A.2d 169 (Pa.             96
    1997)

Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720 (3d Cir. 1989)             96

Case of the Tailors, 77 Eng. Rep. 1218 (1615)                                   79

Taylor v. Kentucky, 436 U.S. 478 (1978)                                         39

Timbs v. Indiana, 586 U.S. 146 (2019)                                           75

Traux v. Raich, 239 U.S. 33 (1915)                                              83

Tribble v. Gardner, 860 F.2d 321 (9th Cir. 1988)                                69

Tsokas v. Bd. of Licensing & Inspections Review, 777 A.2d 1197 (Pa.            41
    Commw. Ct. 2001)

United States v. Bond, 173 F. App'x 144 (3d Cir. 2006)                          67

United States v. Black, 707 F.3d 531 (4th Cir. 2013)                            67

United States ex rel. Customs Fraud Investigators, LLC v. Victaulic Co.,        94
    839 F.3d 242 (3d Cir. 2016)

United States v. Gaskin, 2023 U.S. Dist. LEXIS 103160 (D. Conn. June            67
    14, 2023)

United States v. Playboy Entm't Group, 529 U.S. 803 (2000)                      48

United States v. Lanier, 520 U.S. 259 (1997)                                    90

United States v. Rahimi, 602 U.S. 680 (2024)                               Passim

United States v. Smith, 151 F. Supp. 2d 1316 (N.D. Okla. 2001)                  82

United States v. Supreme Court of New Mexico, 839 F.3d 888 (10th Cir.          19
    2016)

United States v. Ubiles, 224 F.3d 213 (3d Cir. 2000)                         65-66

University of North Carolina v. Foy, 5 N.C. (1 Mur.) 58 (1805)                  77

Wallace v. Kato, 549 U.S. 384 (2007)                                            70

Williams v. Bratton, 656 N.Y.S.2d 626 (App. Div. 1997)                       38-39

In re Winship, 397 U.S. 358 (1970)                                              77

**Statutes**

| | |
|---|---|
| 11 Del. C. § 1447A | 52 |
| N.J. Stat. Ann. § 2C-58-4.6 | 52, 72 |
| 22 P.S. § 12 | Passim |
| 22 P.S. § 13 | 89 |
| 22 P.S. § 14 | Passim |
| 22 P.S. § 16 | 88 |
| 22 P.S. § 25 | 3 |
| 22 P.S. § 41 | 3, 53 |
| 22 P.S. § 44 | 59-60 |
| 22 P.S. § 46 | 60 |
| 35 P.S. § 5604 | 91 |
| 35 P.S. § 5606 | 91 |
| 40 P.S. § 626.3 | 92 |
| 40 P.S. § 3201 | 92 |
| 52 P.S. § 1396.3 | 92 |
| 52 P.S. § 1396.4c | 92 |
| 2 Pa.C.S. § 105 | 42 n.7 |
| 2 Pa.C.S. § 754 | 42 |
| 18 Pa.C.S. § 913 | Passim |
| 18 Pa.C.S. § 2701 | 7, 37 |
| 18 Pa.C.S. § 2711 | 40 |
| 18 Pa.C.S. § 1101 | 58, 90 |
| 18 Pa.C.S. § 1104 | Passim |
| 18 Pa.C.S. § 6102 | 20 |
| 18 Pa.C.S. § 6106 | Passim |
| 18 Pa.C.S. § 6108 | Passim |
| 18 Pa.C.S. § 6109 | Passim |

| | |
|---|---|
| 18 Pa.C.S. § 6114 | 42, 87 |
| 18 Pa.C.S. § 6119 | Passim |
| 25 Pa.C.S. § 1301 | 24 |
| 42 Pa.C.S. § 932 | 44 |
| 42 Pa.C.S. § 932 | 5 |
| 42 Pa.C.S. § 1123 | 44 |
| 42 Pa.C.S. § 1515 | 44 |
| 42 Pa.C.S. §§ 8541-46 | 8, 95 |
| 42 Pa.C.S. § 8550 | 95 |
| 75 Pa.C.S. § 1501 | 53 |
| 18 U.S.C. § 922 | 26 |
| 28 U.S.C. § 1291 | 1 |
| 28 U.S.C. § 1331 | 1 |
| 28 U.S.C. § 1367 | 1 |
| 42 U.S.C. § 1983 | Passim |
| 42 U.S.C. § 1988 | Passim |

## Session Laws

| | |
|---|---|
| Act of Feb. 3, 1813, ch. 89, 1812 Ky. Acts 99 | 33 |
| Act of Jan. 11, 1841, ch. 30, 1840-41 N.C. Sess. Laws 61 | 28 |
| Act of Mar. 18, 1875, No. 38, 1875 Pa. Laws 33 | 33 |
| Act of June 11, 1931, No. 158, 1931 Pa. Laws 497 | 29 |
| Act of Dec. 6, 1972, No. 334, 1972 Pa. Laws 1482 | 31, 50 |
| 16 Charles I, c. 10 (1640), 5 THE STATUTES OF THE REALM 110 | 75 |

## Municipal Laws

| | |
|---|---|
| Philadelphia Home Rule Charter § 5-1005 | 4 |

**Rules of Court**

Fed. R. Civ. P. 8 — 18

Fed. R. Civ. P. 12 — Passim

Pa. R. Crim. P. 527 — 40

Third Circuit IOP 5.2 — 67

Third Circuit IOP 5.3 — 67

Third Circuit IOP 5.7 — 67

**Constitutions**

U.S. Const., amend. II — 21

**Secondary Materials**

Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 YALE L.J. 1672 (2012) — 76

EDWARD COKE, INSTITUTES OF THE LAWS OF ENGLAND (1797 ed., London) (1644)

— vol. 2 — 79

— vol. 3 — 78

STEPHEN P. HALBROOK, THE RIGHT TO BEAR ARMS (2021) — 34, 36

PHILIP HAMBURGER, IS ADMINISTRATIVE LAW UNLAWFUL? (2014) — 75-76

2 JAMES KENT, COMMENTARIES ON AMERICAN LAW (OLIVER WENDELL HOLMES, ed., 12th ed., 1883) — 35

David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 B.Y.U.L. REV. 1359 — 34

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 203 (2018) — 72-73

34th Handbook of the National Conference of Commissioners on Uniform State Laws (1924) — 29

36th Handbook of the National Conference of Commissioners on — 30

Uniform State Laws (1926)

Proclamation of Secretary of State William H. Seward, Certifying that        23 n.3
the Fourteenth Amendment of the Constitution has Been Adopted, No.
13, 15 Stat. 708 (July 28, 1868).

1 NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH        22
LANGUAGE 19 (1828)

## I.   JURISDICTIONAL STATEMENT.

The court below had federal question jurisdiction under 28 U.S.C. § 1331, where Appellant raised claims under 42 U.S.C. § 1983, and supplemental jurisdiction over the Pennsylvania tort claims under 28 U.S.C. § 1367.

On September 24, 2024, the court below dismissed all claims and against all parties without prejudice, and dismissed with prejudice FOP Lodge No. 5. That same day, Appellants filed a notice of appeal and elected to stand on our Second Amended Complaint. That created a final order and this Court has jurisdiction under 28 U.S.C. § 1291; Borelli v. City of Reading, 532 F.2d 950, 951-52 (3d Cir. 1976).

## II.   ISSUES PRESENTED.

In this action under 42 U.S.C. § 1983 and related Pennsylvania tort claims, being Counts 1 through 14 of the Second Amended Complaint:

(1)    Did the District Court err in granting motions to dismiss whether Appellants pled facially plausible claims under the *Twombly-Iqbal* framework?

(2)    Did the District Court err in granting dismissal with prejudice the Philadelphia Lodge No. 5, Fraternal Order of Police?

These issues were preserved below by briefs submitted to the District Court at JA246 to 537.

## III.   STATEMENT OF RELATED CASES.

This appeal raises substantially similar Second Amendment questions as raised in the cases pending before this Court:

<u>Koons v. Platkin</u>, No. 23-1900.

<u>Siegel v. Platkin</u>, No. 23-2043.

Consolidation with the same panel of judges in those appeals would greatly conserve judicial resources and the briefing, including the briefs submitted by *amici*, in those appeals would likewise benefit the Court for the issues raised in this one.

## IV. STATEMENT OF THE CASE.

This action arises under 42 <u>U.S.C.</u> § 1983 and several Pennsylvania torts. Andre Boyer and Pennsylvania S.I.T.E.S. Agents, LLC appeal from a grant of motions to dismiss in favor of Appellees by the District Court. From the pleadings, the following facts are assumed true:

> **A. Over the Course of a Decade, the Philadelphia Police Department, District Attorney's Office, Sheriff, and Others Retaliate against Andre Boyer, a Former Police Officer, by Revoking His Uniform Firearms Act License, Opposing His Applications for a Private Detective License, and Prosecuting Him for Openly Wearing a Firearm in the City for Self-Defense and Employment-Purposes.**

Andre Boyer is a resident of the City of Philadelphia and, for approximately 13 years, had served as a police officer with the Philadelphia Police Department (PPD). [JA110 ¶ 1; JA114-15 ¶ 40]. After this employment ended, in 2013 Boyer launched an online news service called *Serpico News*, which is dedicated to the subject of law enforcement misconduct. [JA115 ¶¶ 44-45]. This made Boyer an enemy of the PPD, the Philadelphia Office of the Sheriff, Philadelphia Lodge No. 5, Fraternal Order of Police ("FOP Lodge No. 5"), and numerous persons employed by

the City. [JA115-16 ¶¶ 47-48]. These persons have done everything imaginable to drive Boyer out of his chosen profession, his right to keep and bear arms, and the City itself. Boyer avers a "wheel conspiracy" among them which "continues so long as Boyer continues to be found" in the City. [Id. ¶ 47].

Without obtaining a Private Detective Act (PDA) license, Boyer has consistently worked for a hotel in the City as a security guard and internal investigator. [JA115 ¶ 42]. The PDA exempts from licensure "any person regularly employed as special agent, detective or investigator exclusively by one employer in connection with the affairs of that employer only," 22 P.S. § 25, and Boyer claims the benefit of that exemption. Within the scope of his employment, Boyer is obligated to wear a uniform and to carry an operable firearm. He obtained a firearms certification under the Lethal Weapons Training Act, 22 P.S. § 41 et seq., so he may qualify in carrying a firearm for employment-purposes. Boyer's responsibilities include protecting employees and guests, any property in the custody of the hotel, and to internally investigate any complaints by patrons against employees. Additionally, Boyer is obligated to conduct a citizen's arrest in the course of his employment if any person commits a felony or breach of the peace in his presence. [JA115 ¶¶ 41-43].

In 2016 and 2017, the PPD, in conjunction with the Philadelphia District Attorney's Office, twice defeated Boyer's application for a license under the Private

Detective Act (PDA). [JA123 to JA130 ¶¶ 101-21]. They asserted, against all evidence to the contrary, that Boyer did not have three years of qualifying experiences and that his rank was no greater than "Patrolman" while employed by the PPD. They invoked a provision of the Act that defines qualifying experiences, which includes "a member of a city police department *of a rank or grade higher than that of patrolman*," 22 P.S. § 14(a) (emphasis added) (the "Patrolman Exception"). [Id]. Although applicants for licensure are submitted before the Court of Common Pleas, the PDA does not afford Boyer the benefit of a jury trial over contested facts. [JA145 ¶ 167(b)].

On May 20, 2016, Boyer attended a civil trial in the Philadelphia Court of Common Pleas at the Juanita Kidd Stout Center for Criminal Justice on Filbert Street (the "Criminal Justice Center"). The trial involved the PPD's decision to terminate a police officer, which implicated the stewardship of FOP Lodge No. 5 as an advocate for its members. [JA192-94 (Tr. 4:12 to 6:1-22)]. A representative from FOP Lodge No. 5 saw Boyer and "was concerned about this." [JA195 (Tr. 7:7 (testimony of John McGrody))].

Following the trial, the PPD revoked Boyer's firearms license under the Uniform Firearms Act (UFA), 18 Pa.C.S. § 6101 et seq. Under the Philadelphia Home Rule Charter, all persons aggrieved by the refusal or revocation of any license may appeal to the Board of License and Inspection Review (the "Board").

<u>Philadelphia Home Rule Charter</u> § 5-1005.[1] Boyer appealed to the Board and a nonjury trial was held on December 20, 2016. There, Deputy Sheriff Robert Lee testified that, during the civil trial at the Criminal Justice Center, FOP Lodge No. 5 contacted him and reported the presence of Boyer and asked Lee to do something about it. Lee then pulled Boyer out of the courtroom and into a hallway and asked if he was armed. Lee admitted he didn't see any gun in the holster Boyer wore. But, as Boyer maintains in this suit, Lee committed perjury by testifying that Boyer admitted to being armed. Because Boyer had a UFA license, Lee didn't arrest him for the summary offense of 18 <u>Pa.C.S.</u> § 913(b)(3) of having "failed to check the firearm" at the court facility. Instead, Lee directed Boyer to check-in his firearm at the appropriate location. [JA116-17 ¶¶ 49 to 58].

On these facts, the Board upheld the revocation of Boyer's UFA license. [JA116 ¶ 51]. The UFA authorized the PPD to so revoke upon a showing of "good cause," 18 <u>Pa.C.S.</u> § 6109(i), an undefined, discretionary standard that allows the licensing authority to make value judgments. But if Boyer had been tried and convicted before the Philadelphia Municipal Court on the summary offense under 18 <u>Pa.C.S.</u> § 913(b)(3), he would have been entitled to an appeal to Common Pleas for a trial *de novo* before a jury. 42 <u>Pa.C.S.</u> § 932.

---

[1] *Available at* https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-265175

Boyer further appealed from the Board's decision to Common Pleas. The UFA incorporates by reference the Local Agency Law, which applies the "Appellate Review Model," requiring Common Pleas to defer to the Board's finding of facts. [See Part VII.E, infra]. On that basis, Common Pleas upheld the revocation.

Multiple false arrests and prosecutions followed as described per seriatim in the Argument Section. Under the UFA, it is a first degree misdemeanor to "carry a firearm, rifle or shotgun at any time upon the public streets or upon any public property in a city of the first class" unless licensed or exempt from licensure. 18 Pa.C.S. § 6108. Philadelphia is the only city of the first class. Under the UFA, the rest of Pennsylvania is "open carry," where no licensure is required. See id. § 6106(a).

In 2019 and 2021, Boyer was twice arrested under Section 6108 when he came to the Philadelphia Court of Common Pleas to give testimony, including in response to a subpoena to testify, and he checked-in his firearm with the deputy sheriffs as local procedure required. In both instances, Boyer wore his security guard uniform and carried his Lethal Weapons Training Act certification. The 2019 arrest was on a warrant and the 2021 arrest was warrantless. In both instances, however, the affiant made no investigation whether Boyer was exempt from licensure on any of the grounds provided in the UFA, 18 Pa.C.S. § 6106(b). [JA117-21 ¶¶ 59 to 82].

Boyer's 2019 arrest was dismissed for failure to prosecute, but, on April 19,

2022, the District Attorney's Office reinstated the charge and Boyer was again arrested and his firearm confiscated. [JA120 ¶¶ 78-80]. Trial was further consolidated with the 2021 arrest and, on March 15, 2023, the Philadelphia Municipal Court rendered judgment of acquittal for Boyer. [JA120-21 ¶ 81].

On March 12, 2021, while Boyer was acting within the scope of his employment, a member of the public engaged in disorderly conduct at the hotel's premises where Boyer is employed. [JA119-20 ¶¶ 72-73]. Boyer effected a citizen's arrest and requested the PPD take the offender into custody. However, upon arrival at the hotel, the police instead arrested Boyer. Boyer was charged with Simple Assault (18 Pa.C.S. § 2701(a)), which were ultimately dismissed without a conviction. [Id.].

In the meantime, the PPD repeatedly refused to return Boyer's firearms and equipment. Boyer was forced to file six motions for return of property in Common Pleas during the years 2021 through 2023. Common Pleas twice ordered the PPD to return Boyer's property, on November 21, 2022 and April 12, 2023. In both instances, the PPD disregarded the court orders and continued to hold onto his property until it was returned the week of May 8, 2023. [JA121-22 ¶¶ 83-90].

In 2023, Boyer filed a new application with the PPD for a Uniform Firearms Act license. On June 8, 2023, the PPD denied his application for reasons further stated in the Argument Section, which we contend violate the Second Amendment

of the U.S. Constitution. [JA122-23 ¶¶ 91-100].

**B.  Procedural Posture**

Roughly one month after the PPD denied his new UFA application, Boyer filed suit on July 27, 2023 in the District Court. [JA2]. Boyer filed an Amended Complaint as of course to join his business entity as a party, Pennsylvania S.I.T.E.S. Agents, LLC. [E.g., JA56 ¶ 2]. With leave of court, Appellants filed the Second Amended Complaint on October 19, 2023, for the purpose of removing, as parties, then Pennsylvania Attorney General Michelle A. Henry and then State Police Commissioner Christopher L. Paris. [See JA60 ¶¶ 33-38]. Thus, Appellants did not have the benefit of amending our pleadings in response to the District Court's comments on the sufficiency thereof.

Motions to dismiss followed. While Civil Rule 12(b)(6) was invoked, nearly all of them raised boilerplate affirmative defenses which the plaintiff is not required by law to anticipate and plead in avoidance: (1) qualified immunity; (2) immunity under Pennsylvania's Political Subdivision Tort Claims Act, 42 Pa.C.S. §§ 8541-46; (3) common law privilege; (4) statute of limitations; (5) lack of standing; and (6) probable cause to arrest.

Lawrence Krasner and the District Attorney's Office filed their own motion

to dismiss and brief, as well as FOP Lodge No. 5,[2] and Appellants filed briefs in response. The remaining nine defendants obtained joint representation and filed a single motion to dismiss, raising boilerplate objections. [See JA273].

On September 24, 2024, the District Court entered an order, dismissing *without* prejudice the Second Amended Complaint in its entirety and against all defendants. The Order further dismissed *with* prejudice FOP Lodge No. 5 on the basis of the statute of limitations. The District Court denied the motion to strike but cautioned undersigned counsel "that any future briefs are to be set forth in one single and concise document as required by his Court's Policies and procedures." [JA2-3].

What's wrong with the Second Amended Complaint as drafted? The District Court stated, "For several constitutional claims, the Court cannot ascertain if Plaintiff is making an as-applied or facial challenge, nor is it clear which specific sections of the Uniform Firearms Act Plaintiff is challenge." [JA3]. Also, "There are also vague allegations of equal protection and due process violations." [Id.]. The District Court ordered, "In filing an amended pleading, if making constitutional challenges, Plaintiff must specifically plead whether each challenge is an as-applied challenge or facial challenge, what specific section of which law is being challenged, and the constitutional basis for said challenge." The District Court provided no

---

[2] Appellants originally obtained a default against FOP Lodge No. 5 but the District Court struck off the same and permitted them to respond.

further comments on the affirmative defenses raised by the defendants.

Unable to further amend and desiring to raise and having in-fact raised both facial and as-applied constitutional claims, on October 24, 2024 Appellants filed a notice of appeal and elected to stand on the Second Amended Complaint.

| | CHART 1: | |
|---|---|---|
| | SUMMARY OF CLAIMS IN SECOND AMENDED COMPLAINT | |
| **Count** | **Defendants** | **Relief Sought** |
| Count 1<br>42 U.S.C. § 1983 | 1. City of Philadelphia<br>2. Phila. District Attorney's Office<br>3. Phila. District Attorney Lawrence S. Krasner<br>4. Phila. Office of the Sheriff<br>5. Phila. Sheriff Rochelle Bilal | Injunctive and declaratory relief declaring unconstitutional the Pennsylvania Uniform Firearms Act, in whole or in part, 18 Pa.C.S. §§ 6101 *et seq.*, and enjoining its enforcement |
| Count 2<br>42 U.S.C. § 1983 | 1. City of Philadelphia<br>2. Phila. District Attorney's Office<br>3. Phila. District Attorney Lawrence S. Krasner<br>4. Phila. Office of the Sheriff<br>5. Phila. Sheriff Rochelle Bilal | Injunctive and declaratory relief, declaring unconstitutional 18 Pa.C.S. § 913, including its discriminatory enforcement and failure to accommodate exercise of Second Amendment rights in a courthouse, and enjoining its enforcement |
| Count 3<br>42 U.S.C. § 1983 | 1. Phila. District Attorney's Office<br>2. Phila. District Attorney Lawrence S. Krasner | Injunctive and declaratory relief, declaring unconstitutional the Pennsylvania Private Detective Act, 22 P.S. §§ 11 *et seq.*, and enjoining its enforcement |

| | | |
|---|---|---|
| Count 4<br>42 U.S.C. § 1983 | 1. Phila. District Attorney's Office<br>2. Phila. District Attorney Lawrence S. Krasner | Injunctive and declaratory relief, declaring unconstitutional the Pennsylvania Private Detective Act, 22 P.S. §§ 11 *et seq*., and enjoining its enforcement |
| Count 5<br>Pennsylvania law | 1. Phila. District Attorney's Office<br>2. Phila. District Attorney Lawrence S. Krasner | Declaratory relief, declaring that Boyer is not collaterally estopped from applying for a license under the Private Detective Act and that the DA's Office is subject to 18 Pa.C.S. § 9124(b) |
| Count 6<br>42 U.S.C. § 1983 | 1. City of Philadelphia<br>2. Phila. Office of the Sheriff<br>3. FOP Lodge No. 5<br>4. Marcus O'Shaughnessy<br>5. William O'Leary<br>6. Frank T. Wallace<br>7. Det. Long<br>8. James Poulos<br>9. Anthony Glaviano<br>10. Wanda Newsom | Damages, including punitive damages, for First Amendment retaliation |
| Count 7<br>42 U.S.C. § 1983 | 1. City of Philadelphia<br>2. Phila. Office of the Sheriff<br>3. FOP Lodge No. 5<br>4. Marcus O'Shaughnessy<br>5. William O'Leary<br>6. Frank T. Wallace<br>7. Det. Long<br>8. James Poulos<br>9. Anthony Glaviano<br>10. Wanda Newsome | Damages, including punitive damages, for Second Amendment retaliation |

| | | |
|---|---|---|
| Count 8<br>42 U.S.C. § 1983 | 1. City of Philadelphia<br>2. Phila. Office of the Sheriff<br>3. FOP Lodge No. 5<br>4. Marcus O'Shaughnessy,<br>   William O'Leary<br>5. Frank T. Wallace<br>6. Det. Long<br>7. James Poulos<br>8. Anthony Glaviano | Damages, including punitive damages, for Fourth Amendment violation |
| Count 9<br>42 U.S.C. § 1983 | 1. City of Philadelphia<br>2. Phila. Office of the Sheriff<br>3. FOP Lodge No. 5<br>4. Marcus O'Shaughnessy<br>5. William O'Leary<br>6. Frank T. Wallace<br>7. Det. Long<br>8. James Poulos<br>9. Anthony Glaviano | Damages, including punitive damages, for malicious prosecution |
| Count 10<br>Pennsylvania law | 1. City of Philadelphia<br>2. Phila. Office of the Sheriff<br>3. FOP Lodge No. 5<br>4. Marcus O'Shaughnessy<br>5. William O'Leary<br>6. Frank T. Wallace<br>7. Det. Long<br>8. James Poulos<br>9. Anthony Glaviano | Damages, including punitive damages, for Pennsylvania tort: malicious prosecution |
| Count 11<br>42 U.S.C. § 1983 | 1. City of Philadelphia<br>2. Phila. District Attorney's<br>   Office<br>3. Phila. Office of the Sheriff | Damages, including punitive damages, for failure-to-train under Monell |
| Count 12<br>Pennsylvania law | 1. FOP Lodge No. 5<br>2. Marcus O'Shaughnessy<br>3. William O'Leary | Damages, including punitive damages, for Pennsylvania tort: trespass |

| | | |
|---|---|---|
| | 4. Frank T. Wallace<br>5. Detective Long<br>6. James Poulos<br>7. Anthony Glaviano | to chattels and conspiracy to commit the same |
| Count 13<br>Pennsylvania law | 1. FOP Lodge No. 5<br>2. Marcus O'Shaughnessy<br>3. William O'Leary<br>4. Frank T. Wallace<br>5. Det. Long<br>6. James Poulos<br>7. Anthony Glaviano | Damages, including punitive damages, for Pennsylvania tort: assault and battery and conspiracy to commit the same. |
| Count 14<br>Pennsylvania law | 1. FOP Lodge No. 5<br>2. Marcus O'Shaughnessy<br>3. William O'Leary<br>4. Frank T. Wallace<br>5. Det. Long<br>6. James Poulos<br>7. Anthony Glaviano | Damages, including punitive damages, for Pennsylvania tort: false imprisonment and conspiracy to commit the same |

## V.    SUMMARY OF ARGUMENT.

Appellants raised facially plausible claims under the *Twombly/Iqbal* framework:

(A)    Lt. Wanda Newsome and the City of Philadelphia have violated Boyer's rights and continue to so violate the same under the Second Amendment, as provided in New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022) by denying Boyer's 2023 application for a firearms license under the Uniform Firearms Act on grounds that fail objective criteria. They fail the Bruen test by replying on subjective assessments of "character," "reputation," and "dangerous to public safety." They engaged in value judgments by relying on a residuary "good cause" and "other." They violated Range v. U.S. Attorney General (*Range II*), 124 F.4th 218 (3d Cir. 2024) (en banc) by relying on unprosecuted arrests and arrests where Boyer obtained judgment of acquittal. To the extent they were directly authorized to act by the text of the UFA, they a facial claim is stated. Otherwise, Boyer has raised a plausible claim whether it sounds on the face of the statute or as applied to the facts.

(B)    Appellees have repeatedly violated and continue to violate Boyer's rights under the Second Amendment and the Equal Protection Clause of the 14th Amendment by constantly enforcing 18 Pa.C.S. §§ 6106(a)(1), relative to openly carrying a firearm within a vehicle, and 6108, relative to openly carrying a firearm on the public property of the City. The rest of Pennsylvania is an open-carry

jurisdiction where no licensure is required. Appellants cannot satisfy strict scrutiny for discriminating against residents and visitors of Philadelphia under Section 6108 or against motorists under Section 6106(a)(1). Additionally, Appellees incurred liability under Frein v. Pennsylvania State Police, 47 F.4th 247, 255-56 (3d Cir. 2022) for failing to promptly return Boyer's firearms, ammunition, and equipment.

(C)     Appellees have repeatedly violated and continue to violate Boyer's Fourth Amendment rights by constantly arresting him for openly carrying a firearm on public property in the City of Philadelphia without any investigation into his licensure or exemption from licensure under the Uniform Firearms Act. Commonwealth v. Hicks, 208 A.3d 916 (Pa. 2019) applied the rule of driver's licensing aspect in Delaware v. Prouse, 440 U.S. 648 (1979) to the context of firearms licensing, which is consistent with Bruen and other decisions by this Court. Probable cause to arrest requires a factual showing of fair probability that the accused was not licensed or exempt from licensure, as a result.

(D)     Appellees have repeatedly violated and continue to violate Boyer's Second Amendment rights in the enforcement of 18 Pa.C.S. § 913 relative to the ability of unlicensed persons, like Boyer, to surrender their firearms upon arriving at a court facility.

(E)     Boyer's fundamental rights secured by the Second Amendment, the Sixth Amendment right to jury trial, and the Due Process Clause of the Fourteenth

Amendment are violated where, as here, the Uniform Firearms Act and the Private Detective Act do not afford a jury trial for disputed facts, whether by way of original commencement or appeal from an agency for a trial de novo in a court of ordinary justice. This is the strongest medicine against discrimination by licensing authorities.

(F)     Appellants had standing to raise claims under the Due Process and Equal Protection clauses of the Fourteenth Amendment against the Private Detective Act, either on its face or as applied to the facts. Where the PDA required three years of qualifying experience to obtain a license, Boyer had such experience by way of his 13 years of service in the Philadelphia Police Department. The Court should enjoin the enforcement of the so-called "Patrolman Exception," where qualifying experiences include "a member of a city police department *of a rank or grade higher than that of patrolman*, for a period of not less than three years." 22 P.S. § 14(a) (emphasis added). Application of collateral estoppel should likewise be enjoined beyond the initial two-year term of a PDA license. The Act defines the licensed activity under the non-exhaustive "includes" but fails to provide for fair warning through a cease-and-desist order process, as seen in comparable licensing statutes, before a criminal prosecution may commence.

(G)     The District Court erred by dismissing with prejudice the Philadelphia Lodge No. 5, Fraternal Order of Police under the statute of limitations. Because amendment is not futile and the law does not require plaintiffs to anticipate and plead in

avoidance of affirmative defenses, dismissal without prejudice should be followed.

(H)     The balance of Appellees' boilerplate affirmative defenses should be denied.

## VI.     STANDARD OF REVIEW.

"An appellate court reviews a . . . decision to grant a motion to dismiss under a plenary standard. The appellate court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant." Connelly v. Lane Constr. Corp., 809 F.3d 780, 786 n.2 (3rd Cir. 2016). "[W]hen there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 787.

"To survive a motion to dismiss, a complaint must state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## VII.    ARGUMENT.

The Court is presented with a rare case involving pervasive and continuing violations of the Second Amendment of the U.S. Constitution and related rights over the course of nearly a decade. Boyer avers that all of the alleged violations are continuing and have chilled his constitutional rights. [JA133-40 ¶¶ 135-59]. The two essential elements of a Section 1983 action are "(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the

Constitution or laws of the United States." <u>Kost v. Kozakiewicz</u>, 1 F.3d 176, 184 (3d Cir. 1993). Under both elements, Appellants stated plausible grounds for relief under the *Twombly/Iqbal* framework, and the motions to dismiss should have been denied and that Philadelphia Lodge No. 5, Fraternal Order of Police, should have been dismissed "without" rather than "with" prejudice.

The District Court erred in concluding that Appellants had pled "vague allegations" and failed to identify legal theories. Our grounds below were adequately briefed and preserved. The U.S. Supreme Court rejected any "heightened pleading standard" and held that Civil Rule 9(b) does not require particularity for Section 1983 liability of government actors. <u>Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit</u>, 507 U.S. 163, 168 (1993). "[A] short and plain statement of the claim," Fed. R. Civ. P. 8(a), "does not require the plaintiff to plead legal theories" or cite statutes or regulations. <u>B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.</u>, 168 F.3d 967, 973 (7th Cir. 1999); <u>Bartholet v. Reishauer A.G.</u>, 953 F.2d 1073, 1078 (7th Cir. 1992). Similarly, "specifying an incorrect theory is not fatal." <u>Id.</u> In Section 1983 cases, to force this degree of minutiae "is unduly harsh." <u>Carter v. City of Philadelphia</u>, 181 F.3d 339, 357-58 (3d Cir. 1999).

We raised constitutional challenges both on the face of the statute and as-applied to the facts. We were entitled to plead both because the line between facial and as-applied challenges is not always clear, even as the case proceeds past the

pleadings stage. "[T]he distinction between facial and as-applied challenges is not so well defined" such "that it must always control the . . . disposition in every case involving a constitutional challenge." Citizens United v. FEC, 558 U.S. 310, 331 (2010). "[A] claim can have characteristics of as-applied and facial challenges: it can challenge more than just [a party's] particular case without seeking to strike the law in all its applications." Green Party of Tennessee v. Hargett, 791 F.3d 684, 691 (6th Cir. 2015). As such, "facial challenges and as-applied challenges can overlap conceptually." United States v. Supreme Court of New Mexico, 839 F.3d 888, 907 (10th Cir. 2016).

A. **Wanda Newsome and the City of Philadelphia Violated and Continue to Violate Boyer's Second Amendment Rights by Denying His Application for a Uniform Firearms Act License based on Discriminatory rather than Objective Criteria under the *Bruen* Test and Which Have No Support in America's History of Firearms Regulation.**

As violations of the Second Amendment of the U.S. Constitution for denying his 2023 application for a license under the Uniform Firearms Act, Boyer seeks damages against Wanda Newsome and the City of Philadelphia in Count 7; damages against the City in Count 11 for failure-to-train; and seeks injunctive relief against the City in Count 1 of the Second Amended Complaint. Boyer alleges that the harm is continuing for each and every day he is deprived of a UFA license. Under Pennsylvania's UFA, it is a first degree misdemeanor offense to openly carry "a firearm, rifle or shotgun at any time upon the streets or upon any public property in

a city of the first class" unless licensed. 18 Pa.C.S. §§ 6108, 6119 (criminal penalty).

Philadelphia is the only first class city in the Commonwealth. 53 P.S. § 101;

Commonwealth v. Bavusa, 832 A.2d 1042, 1044 (Pa. 2003). Under the UFA, the

"sheriff" responsible for reviewing licensure applications is "the chief or head of the

police department" in the City of Philadelphia, rather than the Office of the Sheriff.

18 Pa.C.S. §§ 6102 (definition of "sheriff"), 6109(b), (d). In 2023, this task fell onto

the shoulders of Lt. Newsome, the Commanding Officer of the Gun Permit Unit.

In 2023, Boyer applied for a UFA license. Utilizing an official, check-the-box

form approved by the City, Newsome denied Boyer's application on June 8, 2023,

on the following grounds as shown at JA239:

(1)     "Applicant is an individual whose character and reputation is such that the

individual would be likely to act in a manner dangerous to public safety."

(2)     "Applicant is denied due to good cause."

(3)     "YOUR CONDUCT on the following date(s), which MAY HAVE resulted in

your arrest," and Newsome enumerates: "12/6/2019 – VUFA Arrest; 3/12/2021 –

Simple Assault; 10/19/2021 – VUFA Arrest," where *VUFA* means Violation of

Uniform Firearms Act.

(4)     "Other," and Newsome writes: "9/7/2017 – Common Pleas Court, City

Affirmed the Decision of Revocation that occurred on 5/20/2016."

All of these grounds fail objective criteria and find no shelter in longstanding

history of firearms regulation at the time of the ratification of the Second Amendment of the U.S. Constitution. Where Lt. Newsome acted with direct authorization by the text of the UFA, then Boyer has stated a claim that it is unconstitutional on its face. But whether Boyer's challenge goes to the face of the UFA or as-applied to the facts and circumstances of its enforcement, he has stated plausible claims for relief nevertheless.

The Second Amendment is incorporated against the States under the Fourteenth Amendment. McDonald v. City of Chicago, 561 U.S. 742, 748 (2010). "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that contact." New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 17 (2022). To justify its regulation, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearms regulation." Id. The Court rejected any "means-ends scrutiny," i.e., whether the regulation furthers an important governmental interest. Id.

Boyer meets the first prong. Based on District of Columbia v. Heller, 554 U.S. 570 (2008) and its progeny, "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." Bruen, 597 U.S. at 10. This right of "the people," U.S. Const., amend. II, draws no distinctions in kind and "applies to all Americans." Lara v. Commissioner, 125 F.4th 428, 435 (3d Cir. 2025). Consequently, Boyer's desire to carry a firearm on or about his

person for his own self-defense outside the home and within the City is plainly covered by the text of the Second Amendment.

In that same context, Boyer also desires to carry a firearm whether openly or concealed on his person — and whether he has stated a plausible claim, both of those facts must be tested in this case because 18 Pa.C.S. § 6108 criminalizes both in the City. To "keep" and "bear" arms under the Second Amendment has no distinction between open or concealed carry. At the time of the Founding, to "bear" means "[t]o wear," including "to bear arms in a coat." 1 NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 19 (1828) [JA643], cited with favor in, Heller, 554 U.S. at 581 (relying on Webster's 1828 dictionary to construe "keep" and "bear" under the Second Amendment); Siegel v. Platkin, 653 F. Supp. 3d 136, 154 (D. N.J. 2023) ("[T]he Second Amendment's plain text covers the conduct in question (carrying a concealed handgun) for self-defense in public."), appeal docketed, No. 23-2043 (3d Cir. May 17, 2023). Accordingly, carrying a firearm openly and concealed are both plainly covered by the text of the Second Amendment.

Under the second prong of Bruen, Appellees had to show the court below that the UFA's licensing system, whether on its face or as applied to this case, adhered to "objective criteria," Bruen, 597 U.S. at 80, and consistent with America's historical tradition of firearms regulation "according to its public meaning in 1791,

as that meaning is fixed according to the understandings of those who ratified it" rather than 1868 when the 14th Amendment was ratified.[3] Lara, 125 F.4th at 441. "[L]aws enacted in the late-19th century do not provide as much insight into the original meaning of the right to keep and bear arms as do earlier sources." Id. Objective criteria mean the licensing system is "designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding" persons, "rather than requiring the appraisal of facts, the exercise of judgment, and the formation of an opinion." Bruen, 597 U.S. at 38 n.9 (citing Cantwell v. Connecticut, 310 U.S. 296, 305 (1940) (quotations omitted)). By citing Cantwell, the Court made clear that Second Amendment protections are analogous to First Amendment rights and laws subordinating fundamental rights to government discretion would fail to the same extent: "That is not how the First Amendment works when it comes to unpopular speech or the free exercise of religion." Id. at 70.

Like voter registration, firearms licensing statutes did not exist in 1791. We understand Bruen and Lara to mean, that while the Second Amendment will not bar licensing per se, "objective criteria" cannot embrace modern inventions from the 20th Century and afterwards which have no firmly-rooted, analogues by reference to 1791. Generally, there is no harm by having a person register their name and

---

[3] The Fourteenth Amendment was ratified in 1868. Proclamation of Secretary of State William H. Seward, Certifying that the Fourteenth Amendment of the Constitution has Been Adopted (July 28, 1868), No. 13, 15 Stat. 708.

address with a local licensing authority. It's only where more is demanded that a constitutional problem might emerge. Such objective criteria for licensing must leave no room for *value judgments*, similar to voter registration under 25 Pa.C.S. § 1301(a). Thus, while some criteria for voter registration may fail the Second Amendment standard, the concept of objectivity is similar. Voter registration in 25 Pa.C.S. § 1301(a) obligates the government to *discern* facts but not to *appraise* facts, exercise a value judgment, or form an opinion.

The Appellees had to show the court below there was no plausible claim based on America's historical tradition of firearms regulation at the time of ratification of the Fourteenth Amendment. Reversal is warranted. The allegations set forth clearly-defined and plausible claims for relief. The District Court erred in holding otherwise.

### 1. Subjective Assessments of Character, Reputation, and Dangerousness.

Lt. Newsome first enumerated, "Applicant is an individual whose character and reputation is such that the individual would be likely to act in a manner dangerous to public safety." Newsome <u>did not</u> check the box for "Applicant is prohibited as regulated by Pennsylvania Crimes Code 6109(1)(viii) (Prior Arrest and Convictions)." Thus, Newsome purported to appraise the character and reputation of Boyer, as well as whether he was dangerous to the public safety, by reasons *unrelated* to any disqualifying criminal convictions.

Newsome did what the UFA expressly allows. On its face, the UFA treats as

separate grounds for denying a license: "An individual whose character and reputation is such that the individual would be likely to act in a manner dangerous to public safety," 18 <u>Pa.C.S.</u> § 6109(e)(1)(i), being distinct from whether an individual has a disqualifying criminal conviction under Subdivision (e)(1)(viii). Where detached from any statutory schedule of criminal convictions, each of these components — "character," "reputation," and "dangerous" — involve the "appraisal of facts, the exercise of judgment, and the formation of an opinion." <u>Bruen</u>, 597 U.S. at 38 n.9. In nearly every civil and criminal context where the question arose, this Court and others have all agreed that an assessment of dangerousness "involves a subjective judgment," which "is an undertaking involving substantial uncertainty." <u>E.B. v. Verniero</u>, 119 F.3d 1077, 1108 (3d Cir. 1997) (Megan's Law sex offender registration). Likewise, "whether someone has good moral character is almost necessarily a subjective question, dependent as it is upon the identity of the person or entity examining the issue," and is thus a matter of "discretion." <u>Almario-Kalaw v. INS</u>, 133 F.3d 1147, 1151 (9th Cir. 1997) (deportation).

State courts have construed licensure under the UFA the same way. <u>Harris v. Sheriff of Delaware County</u>, 675 A.2d 400, 403 (Pa. Commw. Ct. 1996) ("[T]he legislature intended in Section 6109 of the Act to confer discretion on sheriffs, empowering them to exercise judgment in applying the Act's standards to determine if applicants should be licensed."). Under Subdivision (e)(1)(i), "character" and

"reputation" are a "single standard for licensure" and not construed disjunctively. Caba v. Weaknecht, 64 A.3d 39, 47 (Pa. Commw. Ct. 2013). Under this ground, the factfinder is permitted to consider "testimony of specific instances of conduct" by witnesses. Id.

Like burdening the right to vote, the U.S. Supreme Court stated in dictum that a statute might be valid if prohibiting "the possession of firearms by felons." Heller, 554 U.S. at 626. In Range v. U.S. Attorney General (*Range II*), 124 F.4th 218 (3d Cir. 2024) (en banc), this Court passed upon the validity under the Second Amendment of 18 U.S.C. § 922(g)(1), which prohibits, in or affecting commerce, the possession of firearms or ammunition by a person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." The Government failed the Bruen test: Prior to 1938 there were no laws which generically prohibited the possession or use of firearms by reason of *any* criminal conviction, much less a felony. Range II, 124 F.4th at 229. The 1938 Federal Firearms Act prohibited possession "only to *violent* criminals," not by reason of whether the offense was punishable by more than one year of imprisonment. Id. This Court rejected the Government's contention that "American legislatures disarmed classes of individuals who posed a danger of misusing firearms." Id. at 230. That is "far too broad" and "at such a high level of generality that it waters down the right." Id. (quotations omitted). From a review of Founding era history, "a felon could

acquire arms after completing his sentence and reintegrating into society." Id. at 231.

In United States v. Rahimi, 602 U.S. 680 (2024), the Court upheld the statute of 18 U.S.C. § 922(g)(8) against a Second Amendment challenge because it applied only for the duration of a judicially-determined restraining order "that the defendant 'represents a credible threat to the physical safety' of another." Rahimi, 602 U.S. at 699, rather than to "the public generally." Id. Such a statute was consistent with Founding-era regulations, such as the surety laws, because its "restriction was temporary as applied to Rahimi," that is, "so long as the defendant 'is' subject to a restraining order," being an adjudication by a court of ordinary justice. Id. at 699. Clearly, a distinction exists between temporary deprivations and "a status-based lifetime ban on firearm possession." Range II, 124 F.4th at 231.

Based on the foregoing authorities, whether Boyer's claim is understood as facial or as-applied, he stated a plausible claim for relief. Newsome and the City of Philadelphia violated Boyer's Second Amendment rights by imposing a lifetime ban on carrying a firearm outside the home within the jurisdiction of the City, openly or concealed. They did not impose the ban by reason of objective criteria, such as a criminal conviction for a violent felony, but based on a subjective assessment of whether he was dangerous to the generic public by reason of his character and reputation. There was no finding that Boyer posed a credible threat to physical safety to any named individual and he was not subject to any restraining PFA order.

In addition to failing objective criteria required for valid licensure, <u>Bruen</u> requires this Court to consider whether there is no historical tradition of firearms regulation by 1791 which allows government actors to impose a lifetime ban on keeping and bearing arms outside the home by reason of a person's character, reputation, or subjective risk of dangerousness to the generic public unconnected with any felony conviction. And this is true regardless of open- or concealed-carry of a firearm.

During the Antebellum, there was only one instance of firearms licensure: The infamous "Black Codes." While these proliferated after slavery ended and before the ratification of the 14th Amendment, one of the earliest recorded statutes originated in 1841 North Carolina which we include in the Appendix. It applied to free blacks and required them to obtain a license to carry a firearm and other arms from a county court one-year before carrying the same, and imposed a misdemeanor offense for any violation of the statute. Act of Jan. 11, 1841, ch. 30, § 1, 1840-41 N.C. Sess. Laws 61, 61-62 [JA553-54]. This Court agrees that the Black Codes do not support any broad proposition that governments can make any and all sorts of class-based exclusions from the right to keep and bear arms as a policy choice. <u>Range II</u>, 124 F.4th at 229-30. These "discriminatory regimes" are "cautionary tales," warning "that when majoritarian interests alone dictate who is 'dangerous,' and thus can be disarmed, disfavored groups become easy prey." <u>Rahimi</u>, 602 U.S. at 776 (Thomas,

*J.*, dissenting).

The Pennsylvania General Assembly enacted the Uniform Firearms Act for the first time by Act of June 11, 1931, No. 158, 1931 Pa. Laws 497.[4] There was previously no law of general applicability in the Commonwealth comparable to firearms licensing. The 1931 law was derived from the same model legislation promulgated by the National Conference of Commissioners on Uniform State Laws (NCCUSL). In 1924, the NCCUSL initially endorsed a report in favor of a model act by the U.S. Revolver Association. In the campaign to adopt this law, the Association publicly asserted, "[L]aw-abiding citizens should be perfectly free to obtain and keep in their homes pistols or revolvers, but no persons other than those authorized by law, should be allowed to carry such weapons abroad without express permission granted after necessity has been shown." U.S. Revolver Ass'n, *The Argument for a Uniform Revolver Law*, reprinted in, 34TH HANDBOOK OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS 719 (1924) [JA595]. Bruen has foreclosed that rationale: We the people have a right to carry a firearm outside the home and, like voter registration, the licensing authorities can go no further than objective criteria in burdening that right.

In 1926, the NCCUSL adopted what became colloquially known as the

---

[4] *Available at* https://www.palrb.gov/Preservation/Pamphlet-Laws/View-Document/19001999/1931/0/act/0158.pdf

Uniform Firearms Act. It required licensure for the concealed-carry of a firearm and that an applicant show "good reason to fear an injury to his person or property, or has any other proper reason for carrying a pistol or revolver, and that he is a suitable person to be so licensed." A Uniform Act to Regulate the Sale and Possession of Firearms § 7, reprinted in, 36TH HANDBOOK OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS 576 (1926) [JA632]. The Commission noted that, in 1923, North Dakota became the first State to enact the Revolver Association's model legislation for firearms licensing. Id., Third Rep. at 571.

Again, that substantive standard is unconstitutional: In Bruen, the New York licensing statute imposed a "proper cause" requirement to carry a firearm openly outside the home. Bruen, 597 U.S. at 12. The Court reasoned, "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." Id. at 71. That rationale extends with equal force whether called *proper cause*, *good reason*, *good moral character*, or *suitable person*. The Second Amendment is violated where government actors exercise value judgments on a case-by-case basis. The discerning of facts is not the appraising of facts.

Under the Bruen test, all of these authorities show that the entire scheme of firearms licensing for open-carry as well as concealed-carry is a creature of the 20th Century and the discretionary value-judgments of the licensing authority were a

modern invention that lost sight of the original meaning of the Second Amendment and which rested on an assumption that the Fourteenth Amendment had not incorporated against the States the fundamental right to keep and bear arms. And the statute of 18 Pa.C.S. § 6108, imposing firearms licensing in the City of Philadelphia for open-carry and concealed-carry, became enacted for the first time by Act of Dec. 6, 1972, No. 334, sec. 1, § 6108, 1972 Pa. Laws 1482, 1577.[5] That's more than 180 years after 1791. Clearly, Appellees cannot meet the second-prong under Bruen.

In the court below, Appellees raised Antonyuk v. Chiumento (*Antonyuk I*), 89 F.4th 271 (2d Cir. 2023), vacated sub nom., ___ U.S. ___, 144 S. Ct. 2709 (2024), for the proposition that subjective assessments of "good moral character" by licensing authorities are not violative of the Second Amendment. That case involved a challenge to New York's concealed-carry permitting statute. Sitting en banc, the U.S. Court for the Second Circuit reasoned, "We respectfully part ways with the Third Circuit, which held in *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122, 134 (3d Cir. 2004)," that the Second Amendment is evaluated by reference to 1791 rather than 1868. Antonyuk v. James (*Antonyuk II*), 120 F.4th 941, 974 (2d Cir. 2024) (en banc), cert. filed, No. 24-795 (U.S. Jan. 22, 2025). The Second Circuit then justified the outcome based on three municipal ordinances from the late

---

[5] *Available at* https://www.palrb.gov/Preservation/Pamphlet-Laws/View-Document/19001999/1972/0/act/0334.pdf

19th Century which imposed a good moral character requirement on firearms licensing: (1) Helena, Montana (1883); (2) Fresno, California (1885); and (3) Monterey, California (1885). Id. at 988 (citations omitted).

Here, by operation of Section 6108 of the UFA, Boyer is deprived of his right to open-carry as well as concealed-carry of a firearm by reason of residing in the City of Philadelphia where a UFA license is required in all cases whatsoever. For Philadelphia residents, such as Boyer, the UFA does not impose a greater or lesser standard for licenses. Secondly, and perhaps just as important, "laws enacted in the late-19th century 'do not provide as much insight into' the original meaning of the right to keep and bear arms as do earlier sources." Lara, 125 F.4th at 441 (quoting Heller, 554 U.S. at 614). For Antonyuk II to eviscerate the second-prong under Bruen based on *three* municipal ordinances from the 1880s is too little, too unpersuasive here to meet the standard of a longstanding tradition.

Under the second-prong of Bruen, there is no history of firearms regulation which affords fewer rights and protections, or different substantive standards for licensing, as applied to concealed-carry rather than open carry. In other words, while Bruen allows licensing based on objective criteria, Appellees cannot urge upon this Court the proposition that concealed-carry warrants a different outcome.

There were no laws prohibiting the concealed carry of firearms *per se* in 1791. As shown below, the *per se* nature of that offense is what made it constitutionally

infirm and that must be distinguished from other bad conduct not protected by the Second Amendment. Consider, for instance, Pennsylvania's 1875 concealed-carry statute. It created a misdemeanor offense if a firearm or any other deadly weapon was carried "concealed upon his person, *with the intent* therewith unlawfully and maliciously to do injury to any other person . . ." Act of Mar. 18, 1875, No. 38, § 1, 1875 Pa. Laws 33, 33 (emphasis added) [JA557]. This was a "tag along" offense in practice, if a wrongdoer had committed an underlying criminal offense *and* had carried concealed a firearm or deadly weapon. Because the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens" in keeping and bearing arms, Heller, 554 U.S. at 635, concealed-carry regulation like Pennsylvania's 1875 statute never implicated the right to keep and bear arms, because enforced against persons who were not law-abiding.

The first law to ban concealed-carry of firearms per se occurred in Kentucky by Act of Feb. 3, 1813, ch. 89, 1812 Ky. Acts 99 [JA551]. It was declared unconstitutional under the Second Amendment analogue in the Kentucky Constitution by Bliss v. Commonwealth, 12 Ky. 90 (1822). Where Bliss was the first State court of last resort to determine the constitutionality of such legislation and invalidated the same, 16 jurisdictions resorted to State constitutional revision to expressly authorize concealed-carry regulation. We include in the Appendix a chart at JA540-41 showing that, between 1850 and 1911, 16 States did so — all in the

South or West. Significantly, State conventions so amended their constitutions even after their State courts held that concealed-carry bans did not offend the right to keep and bear arms.[6] From the chart, this is seen in Georgia (1868), Tennessee (1870), and Louisiana (1879). Ordinary people, in other words, saw that judicial decisions which sustained concealed carry bans were a fiction warranting constitutional revision.

By the ratification of the Fourteenth Amendment, a majority of the States did not ban any concealed-carry of firearms and none of the northern States did so. In 1868, there were 37 States. Of that number, only eight States passed a statute banning concealed-carry during the antebellum — all of them, except for Indiana and Ohio, were in the slaveholding South. STEPHEN P. HALBROOK, THE RIGHT TO BEAR ARMS 218-22 (2021) [JA646-50]. Scholars recognize that concealed-carry legislation originated, not because of racism, but in context of concerted efforts by southern legislatures to curb dueling and "honor" killings, but these efforts "had been undermined by the courts and by juries." David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 B.Y.U.L. REV. 1359, 1416. As such, "The concealed weapons laws were an extension of the antiduelling laws and were intended to prevent the victims of insults from killing the insulter." Id. (citing CLAYTON E.

---

[6] Aymette v. State, 21 Tenn. 154 (1840); Nunn v. State, 1 Ga. 243 (1846); State v. Chandler, 5 La. Ann. 489 (1850).

CRAMER, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM (1999)). In this respect, concealed-carry bans in the 19th Century were insular to the South, and western States which had influxes of southerners, rather than the entire country and dealt with a specific cultural phenomenon.

Within the marginal States that enacted these statutes, the legal profession was openly divided whether the fundamental right to keep and bear arms is violated by the per se nature of prohibiting concealed-carry: "[S]o many men, so many opinions!" Nunn v. State, 1 Ga. 243, 248 (1846). In 1883, Oliver Wendell Holmes, as editor of the 12th edition of Chancellor Kent's *Commentaries*, counted less than 10 State court decisions which ruled on the question, noting "it has been a subject of grave discussion, in some of the state courts, whether a statute prohibiting persons, when not on a journey, or as travellers, from wearing or carrying concealed weapons, be constitutional. There has been a great difference of opinion on the question." Heller, 554 U.S. at 618 (quoting 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW *340 n.2 (Oliver Wendell Holmes, ed., 12th ed., 1883)).

The 19th Century courts that upheld bans on concealed carry of firearms either did not publish any opinion, e.g., State v. Mitchell, 3 Blackf. 229 (Ind. 1833), or reasoned it was valid so long as open-carry remained a viable alternative. E.g., Nunn v. State, 1 Ga. 243, 251 (1846) ("[I]t is valid, inasmuch as it does not deprive the

citizen of his natural right of self-defence."). These decisions were more than 50 years removed from 1791 and had to be viewed through the lens of "the social norms of the day," HALBROOK, supra, at 222 [JA650], where open-carry of firearms was widespread and socially acceptable from the Founding even until the 1920s and 1930s when the UFA emerged. That's not our culture today, where people regularly call the police at the mere sight of a law-abiding person wearing a gun in the holster.

From a review of Antonyuk II, there is no indication that the Second Circuit had considered any of the foregoing authorities, as well as the plain meaning of the text of the Second Amendment, as shown in Noah Webster's 1828 dictionary that Americans in 1791 understood concealed-carry as part of the right to bear arms. The majority of the States did not have any law prohibiting concealed-carry by the time of ratifying the 14th Amendment, and a few State courts were by then divided whether it was constitutional, which sparked State constitutional revisions.

Bruen's toleration of objective criteria does not empower licensing authorities to engage in subjective assessments of a citizen's character, reputation, fitness, and dangerousness, as happened here. Lt. Newsome could ask for Boyer's identifying information and perform a criminal background check for violent felonies or outstanding PFAs or restraining orders. That's about it—and no difference results whether Boyer engages in open-carry or concealed-carry in the City. Based on the foregoing, Boyer pled a plausible claim under the *Twombly*/*Iqbal* framework.

## 2. Acquittals or Arrests without Conviction.

Lt. Newsome additionally denied Boyer's UFA application on the basis of three arrests which did not result in conviction: Two violations of the UFA and Simple Assault. Violations of the UFA are a first degree misdemeanor, which has an authorized sentence of not more than five years of imprisonment. 18 Pa.C.S. §§ 6119, 1104(1). Simple Assault, on the other hand, is a third degree misdemeanor and has an authorized sentence of not more than one year of imprisonment. Id. §§ 2701, 1104(3). Each of these arrests terminated in favor of Boyer: The 2021 Simple Assault was dismissed pretrial. The 2019 and 2021 UFA violations resulted in judgment of acquittal at trial.

Newsome did not check the box for "Applicant is prohibited as regulated by Pennsylvania Crimes Code 6109(1)(viii) (Prior Arrest and Convictions)," but she nevertheless did the same thing: The UFA requires a license to be denied if "[a]n individual who is charged with or has been convicted of a crime punishable by imprisonment for a term exceeding one year except as provided for in section 6123 (relating to waiver of disability or pardons)." 18 Pa.C.S. § 6109(e)(1)(viii). During the pendency of this appeal, the Superior Court of Pennsylvania has now construed Section 6109(e)(1)(viii) and rejected any limiting construction that it means the *pendency* of charges not yet reduced to judgment. Commonwealth v. Livingston, ___ A.3d ___, No. 1546 EDA 2023, 2024 Pa. Super. Unpub. LEXIS 3142, at *26-

27 (Dec. 17, 2024). "This can only be interpreted to mean that a person charged with a crime punishable by imprisonment for a term exceeding one year simply cannot obtain a license to carry a firearm." Id. at *27.

What happened here, therefore, is a lifetime ban even if the accused is acquitted of the charge or it is dismissed without conviction. Boyer has therefore stated a plausible claim that 18 Pa.C.S. § 6109(e)(1)(viii) is unconstitutional on its face as well as its application to the facts. On the same authorities stated in Subpart A.1, supra, including this Court's decision in Range II, where there is no history of firearms regulation by 1791 which enables the State to prohibit persons convicted of any crime, much less a felony, there is likewise no history of doing the same thing by way of acquittals or unprosecuted arrests.

Research suggests ours is the first post-Bruen case in our country where a licensing authority denied a firearms license where the applicant obtained judgment of acquittal, or pretrial dismissal without conviction, of criminal charges. The pre-Bruen cases had upheld the denial of licensure on the basis of arrests, even if an acquittal resulted, the "issuance of a license to carry a gun is a privilege, not a right," and therefore a matter of "discretion" of the licensing authority. Williams v. Bratton, 656 N.Y.S.2d 626, 627 (App. Div. 1997). There, the court likewise assumed the validity of New York's "proper cause" requirement, which Bruen has now nullified. On the other hand, another pre-Bruen case agreed that it violated the constitutional

presumption of innocence to deny a firearms license based on acquittal of criminal charges. State ex rel. Oklahoma State Bureau of Investigation v. Warren, 975 P.2d 900, 904 (Okla. 1998). That court, however, left open whether licensure can be denied if the acquittal was "for a crime involving a firearm or other weapon." Id.

As a matter of constitutional due process, there is a presumption of innocence that is never lost until a finding of guilt beyond a reasonable doubt within a court of ordinary justice. Taylor v. Kentucky, 436 U.S. 478, 490 (1978). A licensing system that avoids "the appraisal of facts, the exercise of judgment, and the formation of an opinion," Bruen, 597 U.S. at 38 n.9, like other constitutional protections, is one restricted to criminal convictions only for enumerated offenses. See, e.g., Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) (prior convictions can be considered by a sentencing court for penalty enhancement without violating the constitutional right to a jury trial). Once again, by analogy to voter registration systems, regulators are limited to criminal convictions only. See 25 Pa.C.S. § 1301(a) ("has not been confined in a penal institution for a conviction of a felony within the last five years"). Otherwise, licensing authorities engage in value judgments by individually assessing whether the person has "fitness to possess a concealed weapon." Williams, 656 N.Y.S.2d at 627. Bruen prohibits that now.

While Bruen has eschewed means-ends scrutiny, it bears mention that States are not without alternatives on this score. Based on the teaching in Rahimi, if the

government has a valid basis to temporarily deny a person's access to firearms during the pendency of criminal charges, then application can be made to the criminal court for a restraining order. Most of the time, this issue is moot where conditions of bail obligate a surrender of arms or through a pretrial confiscation of arms that were used in the commission of the offense. See, e.g., Pa. R. Crim. P. 527 (nonmonetary conditions of bail); 18 Pa.C.S. § 2711(b) (confiscation of weapons in domestic violence cases). But a categorical directive to the licensing authority to deny an application based only on the fact of an arrest violates the Second Amendment under Bruen. At best, the licensing authority could issue a temporary license on a condition that the applicant give reasonably prompt notice when the criminal charges resolve. The UFA has allowed temporary licenses in other contexts. See, e.g., 18 Pa.C.S. § 6109(m.1). Similarly, as a result of Range II, the pendency of criminal charges can only be those of violent felonies. Here, nothing but misdemeanors were concerned. That, clearly, was not enough.

Boyer's claim is more than plausible, but an actual constitutional violation.

### 3. "Good Cause" as Open-Ended Discretion for Granting and Revoking a License within a Star Chamber.

As mentioned, Lt. Newsome checked the box on the City's official form for "good cause" and "other," asserting that Boyer's prior UFA license revocation by the City in 2016 was a sufficient ground. Under the UFA, a license can be denied for "good cause," 18 Pa.C.S. § 6109(e)(1). Likewise, once granted, a UFA license

can be revoked for "good cause." Id. § 6109(i). In both instances, "good cause" is an undefined, independent ground at the licensing entity's discretion. Harris v. Sheriff of Delaware Cnty., 675 A.2d 400, 403 (Pa. Commw. Ct. 1996) (UFA "does not define 'good cause'" and discretionary standard applies to granting and revoking); Morley v. City of Philadelphia Licenses & Inspections Unit, 844 A.2d 637, 640 (Pa. Commw. Ct. 2004) ("good cause" confers "confer discretion" on the licensing entity "to determine if applicants should be licensed."). "[T]his principle applies with equal force to a determination of good cause for the revocation of a license granted under the Act." Tsokas v. Bd. of Licensing & Inspections Review, 777 A.2d 1197, 1202 (Pa. Commw. Ct. 2001). "[W]here discretion is vested in an official there usually is a difference of opinion." Lovering v. Dettre, 41 Pa. D. & C. 716, 718 (C.P. Montgomery 1941) (Uniform Firearms Act).

Thus, Boyer's license was revoked for "good cause" in 2016 and his application for a new license in 2023 denied for "good cause." In both instances, the City exercised its own value judgment. The UFA does not enumerate a previous revocation of a license as a basis for denying a new application. See 18 Pa.C.S. § 6109(e)(1). Under the statutory structure, when a UFA license issues it "shall be valid throughout this Commonwealth for a period of five years unless . . . revoked." Id. § 6109(f)(1). "A judgment sustaining a refusal to grant a license shall not bar, after one year, a new application[.]" Id. § 6114. But "a judgment in favor of the

petitioner" shall not "prevent the defendant from thereafter revoking or refusing to renew such license for any proper cause which may thereafter occur." Id. The State courts have construed this provision to mean that a new license can still be denied, even after the passage of one year, if there are unchanged circumstances. See Bd. of License & Inspection Rev. v. Mirowitz, 520 A.2d 558, 560 (Pa. Commw. Ct. 1987).

Lt. Newsome and the City have therefore imposed a lifetime ban on Boyer's Second Amendment right, utilizing their own value judgments rather than any objective criteria prescribed by statute. In both instances, there was no right to jury trial. There is no pre-deprivation hearing under the UFA when a license is revoked. 18 Pa.C.S. § 6109(i). Instead, an aggrieved person can appeal to the Court of Common Pleas. Id. The UFA incorporates by reference Pennsylvania's Local Agency Law.[7] Id. § 6114. Where, as here, the local agency creates a record of its proceedings, then Common Pleas proceeds "without a jury on the record certified by the agency," and judicial review is limited to the familiar administrative appellate review model whether the agency violated constitutional rights, the statute law, or its own procedures or whether its findings of fact are "not supported by substantial evidence." 2 Pa.C.S. § 754(b).

Bruen nullified New York's "proper cause" requirement and held that

---

[7] In Title 2 of the Pennsylvania Consolidated Statutes, Chapter 7(B) is designated the Local Agency Law. 2 Pa.C.S. § 105.

firearms licensing systems must follow "objective criteria" prescribed by statute. Bruen, 597 U.S. at 80. The distinguishing feature is that the licensing authority cannot have "open-ended discretion" to grant or deny a license. Id. While procedural due process was not directly at issue in Bruen, the Court nevertheless expressed its concerns whether fundamental rights, such as the right to keep and bear arms, would devolve into a Star Chamber. Looking at the New York statute, having a similar structure to Pennsylvania's UFA, the Court observed "[w]hen a licensing officer denies an application, judicial review is limited. New York courts defer to an officer's application of the proper-cause standard unless it is arbitrary and capricious." Id. at 13. In practice, this "leaves applicants little recourse if their local licensing officer denies a permit." Id.

Here, even though the UFA uses the operative phrase, "shall issue," the statute on its face and as enforced nevertheless is an open-ended discretion vested in government actors to utilize value judgments for "good cause." For granting and revoking a UFA license, the "good cause" standard violates the Second Amendment under Bruen because it directs the licensing authority, on a case-by-case basis, to engage in "the appraisal of facts, the exercise of judgment, and the formation of an opinion." Bruen, 597 U.S. at 38 n.9.

The facts of this case make that even uglier: The City has construed revocation proceedings under 18 Pa.C.S. § 6109(i), alongside the Philadelphia Home Rule

Charter, to mean its Department of Licensing and Inspection Review is a Star Chamber that may bypass courts of ordinary justice and put license-holders like Boyer on trial for unprosecuted criminal conduct or summary offenses. In 2016, the Board upheld the City's revocation of Boyer's license on the ground that he committed a *summary offense* under 18 Pa.C.S. § 913 for entering into a Courthouse and having "failed to check the firearm" upon entering. Id. Boyer was never charged with or convicted of that offense in the Philadelphia Municipal Court, the City's equivalent to the magisterial district judge for summary offenses. Compare 42 Pa.C.S. § 1123(a)(1) (subject-matter jurisdiction of Philadelphia Municipal Court) with id. § 1515(a)(1) (subject-matter jurisdiction of magisterial district judges). Boyer alleges that the evidence presented against him before the Board was perjured. But even if we assume for the sake of argument that there was no such perjury, the Board lacked subject-matter jurisdiction for summary offenses. But for the "good cause" standard under the UFA, the City would have had to obtain a conviction against Boyer in a court of ordinary justice. While summary offenses originate in the magisterial district judges or a bench trial in the Philadelphia Municipal Court, Boyer and Pennsylvania residents would enjoy a right of appeal for a de novo jury trial in the Court of Common Pleas. 42 Pa.C.S. § 932.

To revoke an existing license, as well as refuse an application for a UFA license to Boyer, based on a public welfare summary offense fails under Range II

for all the same reasons discussed in Subpart A.2, <u>supra</u>. Anything short of a

conviction for a violent felony violates the Second Amendment. Here, the undefined

"good cause" residuary in Pennsylvania's UFA, for granting and revoking a license,

fails for all the same reasons as did the New York statute construed in <u>Bruen</u>. The

"very enumeration of the right takes out of the hands of government — even the

Third Branch of Government — the power to decide on a case-by-case basis whether

the right is *really worth* insisting upon." <u>Bruen</u>, 597 U.S. at 23. Boyer has done more

than state a plausible claim, but an actual and continuing violation of the U.S.

Constitution.

### 4. Qualified Immunity is Not an Option and *Monell* Liability is Demonstrated.

The City raised the issue of <u>Monell</u> liability,[8] and Lt. Newsome raised the

issue of qualified immunity. Because Boyer seeks injunctive relief, as well as

damages, against the City, the District Court did not—and could not—dismiss the

case on any theory of <u>Monell</u> or qualified immunity, which are applicable to awards

of damages only. <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 244 (3d Cir. 2006)

(qualified immunity not a defense to injunctive relief); <u>Morrison v. Fox</u>, 660 F.2d

87, 88 (3d Cir. 1981) (<u>Monell</u> "would not be dispositive" as to injunctive relief);

<u>Chaloux v. Killeen</u>, 996 F.2d 246, 250 (9th Cir. 1989) (<u>Monell</u> applicable only to

---

[8] <u>Monell v. Dep.'t of Soc. Servs.</u>, 436 U.S. 658 (1978).

damages awards).

Under <u>Monell</u>, Newsome utilized a standardized form approved by the City where denying Boyer's UFA license. The standardized form enumerated categories for denying a license which violate the Second Amendment, as shown below. That supports a reasonable inference that she acted in accordance with a policy or custom of the City. <u>McGreevy v. Stroup</u>, 413 F.3d 359, 367 (3d Cir. 2005).

As to qualified immunity, Boyer alleges that all constitutional violations are "on a continuing basis," chilling his rights. [JA.133 ¶ 135]. Consequently, if any controlling authority is decided *after* Newsome had acted, she and the City remain liable to the extent they do not immediately reverse their decision and grant Boyer a UFA license, i.e., "the failure to discontinue" the harm. <u>Pinsky v. Duncan</u>, 79 F.3d 306, 313 (2d Cir. 1996). The harm continues so long as Boyer doesn't get his license. If they want to limit the amount of their damages during the course of this proceeding, they know exactly what to do. But it so happens that controlling authority, putting them on sufficient notice, was decided before they had acted.

First, that the Second Amendment guarantees a personal right, not militia service, was resolved by <u>Heller</u> in 2008. The incorporation of the Second Amendment against the States was decided in 2010 by <u>McDonald</u>. <u>Bruen</u> was decided June 23, 2022 and makes abundantly clear that any open-ended discretion for firearms licensing, rather than objective criteria prescribed by statute, violates

the Second Amendment. Bruen additionally made clear that the right to carry firearms for self-defense outside the home was based on the "Second Amendment's plain text" and reiterated Heller's holding that self-defense is "the central component" of the right itself. Bruen, 597 U.S. at 33. By invoking the "good cause" standard, as well as subjective assessments of "character," "reputation," and "dangerous," Newsome therefore directly violated Bruen.

Second, a panel of this Court decided Range v. U.S. Attorney General (*Range I*), 69 F.4th 96 (3d Cir. 2023) on June 6, 2023. That occurred before Newsome denied Boyer's UFA application. The U.S. Supreme Court vacated and remanded with instructions to reconsider in light of Rahimi. In Range II, this Court, sitting en banc, reached the same conclusion as Range I that denying a license on any criminal conduct other than a violent felony violates the Second Amendment. Newsome was on notice by Range I and continues to refuse to grant Boyer a license even after this Court decided Range II in 2024. Consequently, by denying Boyer's license on criminal charges where Boyer obtained a dismissal or acquittal, and based on an unprosecuted summary offense in 2016, clearly Range I and Range II are violated.

**B. Appellees Violated and Continue to Violate the Second Amendment and the Equal Protection Clause by Enforcing a Categorical Ban on Open-Carry of Firearms in Philadelphia and by Discriminating against Persons, like Boyer, Who Possess a Lethal Weapons Act Certification for Employment-Purposes.**

Boyer was twice arrested and his firearms and equipment confiscated by the

Police Department and deputy sheriffs; twice prosecuted under Lawrence S. Krasner and the District Attorney's Office; and twice acquitted for violating 18 Pa.C.S. § 6108(a), which creates a first degree misdemeanor offense for carrying a firearm—openly or concealed—"upon the public streets or upon any public property in a city of the first class" unless licensed. Id. Under Count 1, Boyer seeks injunctive relief against the City, the Sheriff, and the Philadelphia District Attorney's Office; under Count 11, Boyer seeks damages for failure-to-train against the City, the Sheriff, and the Philadelphia District Attorney's Office; and under Counts 7 and 9, Boyer seeks monetary damages against the City, the Sheriff, and each officer or deputy sheriff who participated in his arrests and confiscation of his firearms and property: Marcus O'Shaughnessy, William O'Leary, Detective Long, James Poulos, and Anthony Glaviano.

The Second Amendment standard is set forth in Subpart A, supra. As to the Equal Protection Clause, because Boyer has a fundamental right to openly carry a firearm for self-defense outside his home as recognized in Heller and Bruen, and to engage in one's chosen trade or profession, Greene v. McElroy, 360 U.S. 474, 492 (1959), strict scrutiny is applied. Brown v. Borough of Mahaffey, 35 F.3d 846, 850 (3d Cir. 1994). To survive strict scrutiny, the government must show the regulation is necessary to serve a compelling governmental interest, United States v. Playboy Entm't Group, 529 U.S. 803, 813 (2000), and narrowly tailored to further that

interest. <u>Adarand Constructors v. Pena</u>, 515 U.S. 200, 235 (1995).

For the reasons stated below, reversal is warranted. The allegations set forth clearly-defined and plausible claims for relief. The District Court erred in holding otherwise.

### 1. Facial Challenge to 18 Pa.C.S. §§ 6106(a)(1) and 6108.

Under the UFA, licensure is imposed for concealed-carry of a firearm for all Pennsylvania jurisdictions *outside of* Philadelphia, thereby leaving untouched the fundamental right to openly carry a firearm outside the home for self-defense. <u>See</u> 18 <u>Pa.C.S.</u> § 6106(a)(1). But, as mentioned, the City is singled-out where licensure is necessary for open-carry and concealed-carry. <u>Id.</u> § 6108(a). UFA licensure is further imposed to carry a loaded firearm *openly* while traveling in a vehicle under Section 6106(a)(1) and the State courts have construed it as applying to open-carry. <u>Commonwealth v. Biever</u>, 283 A.3d 866, 869 (Pa.Super. 2022). Boyer desires to openly carry a firearm for his self-defense while outside his home and in the City, including while he travels to and from his place of employment, and while operating a vehicle. [JA133-35 ¶¶ 135 to 140,; JA140-41 ¶ 161(b)].

Under the Equal Protection Clause, "all persons similarly circumstanced shall be treated alike." <u>Plyler v. Doe</u>, 457 U.S. 202, 216 (1982) (quotation omitted). Boyer has pled a plausible claim that the statute is facially unconstitutional by discriminating against Philadelphian residents and visitors, imposing greater

restrictions on them for the open-carry of firearms which are not imposed on residents and visitors anywhere else in Pennsylvania. In Bruen, the Court reasoned directly in a manner that is fatal to 18 Pa.C.S. § 6108 on its face. The Court ruled that cities are *not* "sensitive places" justifying a different result in the exercise of Second Amendment rights:

> Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.

Bruen, 597 U.S. at 31 (citation omitted). And where that could not be done for a single municipality, neither could it be done for the entire State of New York, as did the statute under review in Bruen.

As mentioned, the statute of 18 Pa.C.S. § 6108 was adopted for the first time within the 1972 Crimes Code. Act of Dec. 6, 1972, No. 334, sec. 1, § 6108, 1972 Pa. Laws 1482, 1577. On the same authorities discussed in Subpart A, supra, under the Bruen test, there is no longstanding, historical tradition in America of licensing the open-carry of firearms prior to the 20th Century. There is likewise no tradition of exempting an entire city within a State from the fundamental right of openly carrying a firearm for self-defense without a license, particularly one as geographically sizable as Philadelphia.

For purposes of Equal Protection, the reasoning in Bruen is instructive: That Philadelphia is an urban space and protected generally by the Philadelphia Police

Department are not compelling governmental interests which justify the discrimination. Where residents and visitors of Pennsylvania can open-carry firearms without a license, so can those in Philadelphia. Their fundamental right to keep and bear arms and need for self-defense outside the home are similarly-situated. With more than 1.5 million residents, it bears mention that Philadelphia was more populous than 12 States under the 2020 Census.

Finally, as a matter of strict scrutiny under the Equal Protection Clause and examining the history of firearms regulation under Bruen, there is no principled basis to allow unlicensed open-carry of firearms while walking on foot but not while operating a vehicle. The UFA creates exemptions for ordinary persons if traveling in their vehicle to and form their home if "the firearm is not loaded," 18 Pa.C.S. § 6106(b)(4), or to and from their home and place of business or place of repair, sale, or appraisal if the firearm "is not loaded and is in a secure wrapper," id. § 6106(b)(8).

This standard fails District of Columbia v. Heller, 554 U.S. 570 (2008) and its progeny. In Heller, because the Second Amendment protects an individual's right for self-defense, a law which requires firearms to "be rendered and kept inoperable at all times" violates the Constitution because "[t]his makes it impossible for citizens to use [firearms] for the core lawful purpose of self-defense," id. at 630. Where, as mentioned, Bruen recognizes the right of self-defense outside of the home, Heller and Bruen are construed in tandem: Section 6106(a)(1) of the UFA categorically

prohibits Americans from carrying an operable firearm while traveling in their vehicle for the core lawful purpose of self-defense. Persons are not shorn of their constitutional rights "when they step from the sidewalk into their automobiles." Delaware v. Prouse, 440 U.S. 648, 662-63 (1979).

In Koons v. Platkin, 673 F. Supp. 3d 515 (D. N.J. 2023), appeal filed, No. 23-1900 (3d Cir. May 17, 2023), the court granted a preliminary injunction against a ban against carrying a loaded and operable firearm within a vehicle. Id. at 149-50 (citing N.J. Stat. Ann. § 2C:58-4.6(b)(1)). Looking at America's history of firearms regulation, the court rejected any comparison with the limited concealed-carry bans in the Southern states because these laws contained exemptions for "those traveling or on a journey." Id. at 293. That case is pending before this Court and the outcome should be similar: Under the Equal Protection Clause, where the UFA allows unlicensed open-carry of firearms while walking on foot, as a matter of strict scrutiny there should likewise be open-carry of firearms while operating a vehicle.

The UFA is not narrowly-tailored here. Other jurisdictions criminalize the possession of a firearm during the commission of a felony, whether the firearm was used or not (e.g., 11 Del. C. § 1447A), which is a less-restrictive alternative to the per se criminalization, as a first degree misdemeanor, of openly carrying a firearm in a vehicle without a license. If there is an important governmental interest behind the enforcement of firearms licensure, then that interest is akin to driver's licensing:

The Vehicle Code imposes a civil fine of $200 as a summary offense for failure to produce a driver's license and gives the accused the opportunity to produce the license before the minor judiciary for a reduction of the fine, if the motorist had a license and forgot to carry it by inadvertence. 75 Pa.C.S. § 1501(d). That's a far cry from a first degree misdemeanor with an authorized sentence of five years of imprisonment imposed under the UFA. 18 Pa.C.S. §§ 6119, 1104(1). Such a harsh punishment is chilling on constitutional rights and fails the Equal Protection Clause, as well as the Second Amendment under Bruen.

On its face, these statutes fail under the Second Amendment and strict scrutiny under the Equal Protection Clause of the Fourteenth Amendment.

### 2. As-Applied Challenge to 18 Pa.C.S. § 6108.

Appellees' conduct also violates the Equal Protection Clause as-applied to the category of persons, like Boyer, who possess a Lethal Weapons Training Act certification and were acting in the scope of employment in the City.

Here, Boyer sought and obtained a firearms certification under the Lethal Weapons Training Act (22 P.S. § 41 et seq.) from the Pennsylvania State Police, which is also called an Act 235 certification. When Boyer was arrested in 2021 for openly carrying a firearm in the City of Philadelphia (18 Pa.C.S. § 6108), while he was on duty as a private security guard and in "full uniform," he produced his Lethal Weapons Training Act certification but was arrested anyway. [JA120 ¶¶ 74-80].

Boyer was arrested on October 19, 2021, where he came to the Criminal Justice Center to testify in a case. [Id.]. Upon entering the courthouse, he surrendered his firearm to a deputy sheriff to be placed in a secure gun locker and was permitted to do so. [Id. ¶ 76]. He was in full uniform, being employed as a private security guard for a hotel. [JA115 ¶¶ 41-42; JA120 ¶ 75; JA130-31 ¶ 123]. A deputy sheriff, Lt. O'Leary, arrested Boyer for the offense of openly carrying a firearm in Philadelphia (18 Pa.C.S. § 6108), even though Boyer was traveling to and from his employment as a private security guard and produced a Lethal Weapons Act certification, showing that he was qualified to carry a firearm through a training and education program administered by the Pennsylvania State Police. [JA115 ¶¶ 41-43; JA120 ¶¶ 74-77]. O'Leary acted with malice towards Boyer in doing so. [JA140 ¶ 157].

Substantially the same thing happened on December 5, 2019. While acting in the scope of his employment as a private security guard, Boyer came to the 35th Police District Headquarters in Philadelphia to surrender property on behalf of his employer. While standing in the lobby of the Headquarters, officer Marcus O'Shaughnessy asserted that he saw Boyer openly wearing a firearm in his holster. Without any further facts if Boyer was compliant with the UFA, O'Shaughnessy, or someone acting on his behalf, obtained an arrest warrant and arrested Boyer under 18 Pa.C.S. § 6108. [JA117-18 ¶¶ 59-64]. The 2019 charge was dismissed, but

Defendants caused it to be refiled in 2022, and Boyer prevailed in obtaining judgment of acquittal. [JA120-21 ¶¶ 78-81].

The offense of 18 Pa.C.S. § 6108(2) exempts any person who is also exempted from licensure. As previously stated, the UFA exempts, "Agents, messengers and other employees of common carriers, banks, or business firms, whose duties require them to protect moneys, valuables and other property in the discharge of such duties." Id. § 6106(b)(6). Appellees engaged in discriminatory enforcement of the UFA, knowing that Boyer was traveling to and from his place of employment and came to the courthouse to testify. Appellees had no grounds that Boyer was engaged in unlawful conduct other than merely possessing a firearm in the City of Philadelphia.

Under the Uniform Firearms Act, the Supreme Court of Pennsylvania held that licensure is not an element of the offense for a prosecution under 18 Pa.C.S. § 6108, and therefore does not have to be proved beyond a reasonable doubt by the Commonwealth. Commonwealth v. Bigelow, 399 A.2d 392, 396 (Pa. 1979). The State courts held that exemptions from licensure are affirmative defenses rather than elements of the offense. Commonwealth v. Lopez, 565 A.2d 437, 440 (Pa. 1989) (exemptions from licensure in 18 Pa.C.S. § 6106(b)).

In addition to failing the Fourth Amendment, see Subpart C, infra, the enforcement of the UFA by Appellees violates the Second Amendment by creating

a chilling effect on the exercise of a constitutional right, through improper prior restraints where a person legitimately seeks and actually complies with a State's licensing system and its exemptions.

In the application of facially valid laws, "[C]onstitutional violations may arise from the deterrent, or chilling, effect of government regulations that fall short of a direct prohibition against the exercise" of constitutional rights. <u>Laird v. Tatum</u>, 408 U.S. 1, 11 (1972) (citations omitted). "The risk of a chilling effect" on the exercise of a constitutional right "is enough" to show harm, because constitutional "freedoms need breathing space to survive." <u>Americans for Prosperity Found. v. Bonta</u>, 594 U.S. 595, 618-19 (2021) (quotation omitted).

"[A] chilling effect amounts to a cognizable" constitutional injury "only if it is objectively reasonable—that is, if the challenged government action is likely to deter a person of ordinary firmness from the exercise" of constitutional rights. <u>Abbott v. Pastides</u>, 900 F.3d 160, 169 (4th Cir. 2018) (citations omitted). "Of course, a severe criminal penalty can have a chilling effect on speech," but the U.S. Supreme Court recognizes that the Constitution shields against governmental efforts to restrict rights "even when enforced through 'trivial' forms of punishment," such as adverse employment decisions. <u>Free Speech Coalition, Inc. v. U.S. Attorney General</u>, 974 F.3d 408, 425-26 (3d Cir. 2020) (discussing <u>Rutan v. Republican Party of Illinois</u>, 497 U.S. 62, 75 n.8 (1990)). Collateral consequences of enforcement can also be

considered in determining a chilling effect. Cook County v. Wolf, 962 F.3d 208, 231 (7th Cir. 2020).

Under Bruen and the protections of the Fourteenth Amendment, this is not how constitutional rights are supposed to function. In Bruen, the Court made clear that Second Amendment rights are analogous to others: "This Second Amendment standard accords with how we protect other constitutional rights," Bruen, 597 U.S. at 24 (comparing First Amendment precedents), including the First Amendment, where government prosecutorial discretion "is not how the First Amendment works when it comes to unpopular speech or the free exercise of religion." Id. at 70. The Court applied to the Second Amendment the First Amendment case of Cantwell v. Connecticut, 310 U.S. 295, 305 (1940) for the proposition that objective criteria within a firearms licensing system, on its face or in its application to particular facts, cannot involve the "appraisal of facts, the exercise of judgment, and the formation of an opinion" by licensure enforcement officers. Bruen, 597 U.S. at 38 n.9. In Cantwell, a Connecticut statute vested the Secretary of the Public Welfare Council with discretion whether to approve any application for soliciting members of the public for religious, charitable, or philanthropic causes, other than solicitations directed to the membership of one's own nonprofit organization. 310 U.S. at 302. The penalty for noncompliance was imprisonment of not more than 30 days and a fine of not more than $100, id. at 301-02, which, in 1938 when the Cantwells were

prosecuted,[9] would amount to approximately $2,209.00 today.[10] The Court reasoned, "In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom." Id. at 304. Unduly infringing protected rights is a different way of saying whether a chilling effect is had. Because the licensing process involved bureaucratic discretion, rather than objective criteria where a permit or certificate issues "as a matter of course," id. at 305, the Court held, "A statute authorizing previous restraint upon the exercise of the guaranteed freedom by judicial decision after trial is as obnoxious to the Constitution as one providing for like restraint by administrative action." Id. at 306.

Here, a UFA violation is a Third Degree misdemeanor, 18 Pa.C.S. § 6119, punishable by a fine of not more than $2,500 and imprisonment for not more than one year. Id. §§ 1101(6), 1104(3). The direct consequences are worse than the Connecticut statute in Cantwell. Additionally, as a collateral consequence, Appellees maintain they can oppose UFA licensure based on unprosecuted violations of the UFA, thereby preventing a law-abiding person from complying with the UFA through licensure to begin with and thereby working a lifetime exclusion of Second Amendment rights.

The State courts held the Lethal Weapons Training Act certification is not an

---

[9] State v. Cantwell, 8 A.2d 533, 535-36 (Conn. 1939).
[10] *Available at* https://www.usinflationcalculator.com/

equivalent to licensure under the UFA. <u>Commonwealth v. Anderson</u>, 169 A.3d 1092 (Pa.Super. 2017) (construing 18 <u>Pa.C.S.</u> § 6106(b)). Boyer additionally alleges that he and other persons who are employed as private security guards and have Lethal Weapons Training Act certifications are similarly-situated to other persons exempt from licensure. [ECF No. 18 ¶ 150]. The UFA exempts from licensure, "Agents, messengers and other employees of common carriers, banks, or business firms, ***whose duties require them to protect moneys, valuable and other property in the discharge of such duties***." 18 <u>Pa.C.S.</u> § 6106(b)(6) (emphasis added). The Lethal Weapons Training Act is mandatory for a person to carry a firearm while a privately employed security guard or agent. 22 <u>P.S.</u> § 44(b). Thus, a person with firearms certification under the Lethal Weapons Training Act is presumptively within the scope of 18 <u>Pa.C.S.</u> § 6106(b)(6) and producing such certification for inspection by a police officer should be equivalent to a person who produces a UFA license. In those circumstances, it is manifestly improper for a police officer to make an arrest in the absence of additional facts supporting probable cause whether the firearm was possessed for an unlawful purpose other than mere licensure under the UFA.

Boyer alleges that he was arrested while engaged in his relevant dues as a private security guard—and Appellees assert they can arrest *anyone*, at any time, even while engaged in their relevant duties as a private security agent. Appellees argued that a Lethal Weapons Training Act certification says nothing about a

person's character and judgment to carry a firearm without creating a public safety risk. But applicants for a Lethal Weapons Training Act certification must be at least 18 years of age and must include their "full name, age, residence, present and previous occupations and such other information that may be required by the commissioner to show *the good character, competency and integrity of the applicant*." 22 P.S. § 46(b) (emphasis added). But, unlike the UFA, the Lethal Weapons Training Act is compliant with the need for objective criteria under Bruen because the State Police may not deny an application if the applicant "has not been convicted of or has pleaded guilty or nolo contendere to a crime of violence . . ." Id. § 46(f). Under the Lethal Weapons Training Act, applicants must produce their fingerprints and two current photographs of themselves and pay a fee for a criminal background check. Id. § 46(c)-(d). The UFA does not expressly require fingerprinting of UFA licensure applicants, see 18 Pa.C.S. § 6109, although local practice may vary.

In fact, the Lethal Weapons Training Act is stricter than the UFA because it requires applicants, like Boyer, to complete an "education and training program in the handling of lethal weapons, law enforcement and protection of rights of citizens," 22 P.S. § 44(a). The UFA does not require applicants for licensure to have any particular skill in the handling of firearms. See 18 Pa.C.S. § 6109. Based on the foregoing, Boyer stated a plausible claim for relief.

### 3. Failure to Promptly Return Firearms, Ammunition, and Property When Criminal Charges Terminated in Favor of Andre Boyer.

In addition to arresting Boyer in 2019 and 2021, the Appellees seized his firearms, ammunition, and equipment. Even after Boyer obtained judgment of acquittal on March 15, 2023, Appellees did not return his property until the week of May 8, 2023. [JA120-22 ¶¶ 81, 89]. As a result, Boyer incurred a claim for compensatory damages from the delay itself and from having to litigate multiple motions for return of property. [Id. ¶¶ 83-90]. Appellees continued to delay the return of property even after the Court of Common Pleas so ordered such return on April 12, 2023. [Id. ¶ 88].

Under the Second Amendment, Appellees cannot create a system of firearms confiscation upon arrest and refuse to return the same even when the charge terminated in that person's favor. In Frein v. Pennsylvania State Police, 47 F.4th 247, 255-56 (3d Cir. 2022), this Court recognized a cause of action under Section 1983 for a Second Amendment violation where State actors had lawfully obtained firearms and ammunition through a warrant but unjustifiably failed to promptly return the same when criminal charges terminate in favor of the accused. Based on the foregoing, Boyer pled a plausible claim under the *Twombly/Iqbal* framework.

**C.    Appellees Violated and Continue to Violate the Second and Fourth Amendments by Arresting Boyer and Seizing His Firearms without Probable Cause Regarding Exemption from Licensure.**

The Second Amended Complaint sets forth violations of the Fourth Amendment in addition to the Second. Under Counts 7 and 8, Boyer seeks monetary damages against the City, the Sheriff, and the individual officers and deputy sheriffs who participated in his arrests and confiscation of his firearms and property.

Under 42 U.S.C. § 1983, "One who directs or assists an unlawful arrest may be liable." Gordon v. Degelmann, 29 F.3d 295, 298 (7th Cir. 1994) (citing Kilbourn v. Thompson, 103 U.S. 168, 200 (1880)). "As a general rule, a government official's liability for causing an arrest is the same as for carrying it out." Berg v. County of Allegheny, 219 F.3d 261, 272 (3d Cir. 2000) (citations omitted). "It is thus clear that § 1983 liability for an unlawful arrest can extend beyond the arresting officer to other officials whose intentional actions set the arresting officer in motion." Id. An individual is "responsible for the natural consequences of his actions." Id. (quotation omitted). "It is irrelevant that he might have taken the same action had he acted in a purely private capacity." Griffin v. Maryland, 378 U.S. 130, 135 (1964).

For the reasons stated below, reversal is warranted.

**1.    A Plausible Claim is Stated.**

No person should lose their Fourth Amendment rights simply for exercising those secured under the Second. Where Boyer was twice arrested in Philadelphia for

openly carrying firearms under 18 Pa.C.S. § 6108, one was conducted with and the other without a warrant. Appellees predicated their probable cause to arrest on openly carrying a firearm on public property, standing alone. No investigation was made whether Boyer was exempt from licensure under the UFA, i.e., "[a]gents, messengers and other employees . . . whose duties require them to protect moneys, valuables and other property in the discharge of such duties." Id. § 6106(b)(6). By reason of his employment as a private security guard and internal investigator for a hotel in the City, Boyer is obligated to carry a firearm in a holster and wear a uniform.

Appellees make much of the fact that licensure and its exemptions are, under the UFA, *affirmative defenses* which the prosecution need not prove beyond a reasonable doubt at trial. Commonwealth v. Bigelow, 399 A.2d 392 (Pa. 1979) (licensure under 18 Pa.C.S. § 6108); Commonwealth v. Lopez, 565 A.2d 437, 440 (Pa. 1989) (exemptions from licensure in 18 Pa.C.S. § 6106(b)). Their argument is misplaced. Controlling precedents, including the force and effect of Bruen and Delaware v. Prouse, 440 U.S. 648 (1979), provide that Fourth Amendment protections do not draw any such distinctions here.

After the Second Amended was incorporated against the States, the Supreme Court of Pennsylvania decided Commonwealth v. Hicks, 208 A.3d 916 (Pa. 2019). There, municipal police officers seized a motorist, acting on information from an

identified informant that he was carrying a firearm concealed, when in actuality he possessed a valid license. Id. at 921-23. As a result of the seizure, the motorist was convicted for DUI, his motion to suppress was denied by the trial court. Id. In vacating the judgment, the Supreme Court of Pennsylvania recognized that, for Fourth Amendment purposes, licensure under the UFA is no different than licensure under the Vehicle Code, and the outcome is controlled by Delaware v. Prouse, 440 U.S. 648 (1979):

> Like the carrying of a firearm without a license, it also is unlawful to drive an automobile without a license. In *Prouse*, the Supreme Court of the United States held that, absent reasonable, articulable suspicion that a particular motorist is unlicensed or that a particular vehicle is unregistered, and without any other independent basis to seize a vehicle or its occupants, "stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment."

Hicks, 208 A.3d at 941 (quoting Prouse, 440 U.S. at 663).

In Prouse, the government claimed law enforcement officers had unfettered discretion to stop any motorist to "spot check" whether the motorist was licensed. "In addressing whether the Fourth Amendment tolerates 'spot checks' of motorists' driver's licenses, the *Prouse* Court made no inquiry into whether possession of a driver's license is an affirmative defense in the subject jurisdiction, or whether nonlicensure is an element of the crime of driving without a license. The Court's concern in *Prouse* was with 'unfettered governmental intrusion' upon the rights of the individual solely at the 'unconstrained discretion' of a single law enforcement

officer in the field." <u>Hicks</u>, 208 A.3d at 942.

If it were otherwise, then legislatures have "the power to erase the protections of the Fourth Amendment for any individual who seeks to comply with the legislature's own licensing requirements," by characterizing licensure and its exemptions as affirmative defenses rather than as elements of the offense. <u>Hicks</u>, 208 A.3d 942. Therefore, for purposes of conducting a *Terry* stop:

> Unless a police officer has prior knowledge that a specific individual is not permitted to carry a concealed firearm, and absent articulable facts supporting reasonable suspicion that a firearm is being used or intended to be used in a criminal manner, there simply is no justification for the conclusion that the mere possession of a firearm, where it lawfully may be carried, is alone suggestive of criminal activity.

<u>Id.</u> at 937. In this context, licensure and its exemptions do not go to the possibility of innocent conduct, but whether there were reasonable and articulable grounds *of criminal conduct to begin with*. "The Commonwealth cannot simply point to conduct in which hundreds of thousands of citizens lawfully may engage, then deem that conduct to be presumptively criminal." <u>Id.</u> at 940.

Licensure under the UFA "is not a 'special needs' situation" which justifies relaxation of Fourth Amendment standards for particularized suspicion. <u>Id.</u> at 946. <u>Hicks</u> is followed in prosecutions under 18 <u>Pa.C.S.</u> § 6108. <u>Commonwealth v. Jackson</u>, 302 A.3d 737, 753 (Pa. 2023); <u>Commonwealth v. Malloy</u>, 257 A.3d 142, 153-55 (Pa.Super. 2021).

This Court reached a similar result in <u>United States v. Ubiles</u>, 224 F.3d 213

(3d Cir. 2000). The fact that the accused possessed a firearm at a public event provides "no reason to believe," as a ground for a *Terry* stop, that he "was engaged in or planning or preparing to engage in illegal activity due to his possession of a gun." Id. at 218. "The *Ubiles* court provided an analogy to the lawful possession of a different object—a wallet, which may or may not contain unlawful counterfeit bills. The mere possibility that a wallet could contain counterfeit bills, the *Ubiles* court reasoned, does not entitle a police officer to infer their presence in the absence of reasonable, articulate suspicion." Hicks, 208 A.3d at 935.

If Boyer openly carried a firearm and within the City are not enough to justify a *Terry* stop, then Appellees lacked the quantum of facts for probable cause to arrest. Here, under the totality of the circumstances test, on both occasions that Boyer was arrested the Appellees observed him (1) during normal business hours within the workweek; (2) wearing his security guard's uniform; and (3) that he possessed a Lethal Weapons Training Act certification, demonstrating that he's qualified to carry and use a firearm in the course of his employment as a security guard. Appellees had nothing else. Boyer was thus engaged in lawful conduct and Appellees made no attempt to ascertain if he was exempt from licensure under Section 6106(b)(6).

The City of Philadelphia and the Sheriff have not adopted any such policy for their police officers and deputy sheriffs to have done that, rendering the City and Sheriff liable for failure to train and to supervise under Count 11.

Therefore, Boyer's conduct was presumptively constitutional under <u>Bruen</u> and, under the Fourth Amendment, furnishes no probable cause whatsoever to have arrested him without more. Federal courts in other jurisdictions have reached the same result. <u>E.g.</u>, <u>United States v. Gaskin</u>, 2023 U.S. Dist. LEXIS 103160, at *16 (D. Conn. June 14, 2023). "Being a felon in possession of a firearm is not the default status" under the Fourth Amendment. <u>Hicks</u>, 208 A.3d at 934 (quoting <u>United States v. Black</u>, 707 F.3d 531, 540 (4th Cir. 2013)). Because Boyer was openly carrying a firearm during the scope of his employment as a private security guard, while wearing his uniform, and was qualified to do so under the Lethal Weapons Training Act, there was no probable cause to have arrested. Based on the foregoing, Boyer pled a plausible claim.

> **2.  Qualified Immunity is Not an Option and Appellees are Estopped from Asserting It.**

Appellees raised qualified immunity. They maintain they were free to disobey <u>Commonwealth v. Hicks</u>, 208 A.3d 916 (Pa. 2019) and adhere to <u>United States v. Bond</u>, 173 F.App'x 144 (3d Cir. 2006). As stated above, <u>Bond</u> is pre-<u>Heller</u> and pre-<u>McDonald</u>. <u>Bond</u> relied on State court decisions which have been overruled. And <u>Bond</u> is a non-precedential decision which, under this Court's Internal Operating Procedures, is one which lacks "institutional value" and is not circulated to the full court before filing, and binds only the parties to the case. Third Circuit IOP 5.2, 5.3, and 5.7

Where Boyer seeks injunctive relief, the defense is not available. <u>Hill</u>, at 244. Where Boyer does seek monetary damages from the Fourth Amendment violations, the Court can clarify why the law of estoppel prevents qualified immunity here. The qualified immunity argument may have been viable if Appellees were federal rather than State agents. But such is not the case. The decision in <u>Commonwealth v. Hicks</u>, 208 A.3d 916 (Pa. 2019) is directly on point. It was decided on the Fourth Amendment itself and the Supreme Court of Pennsylvania declined to consider if the State constitution afforded greater protections. <u>Id.</u> at 367-68 ("we need not conduct separate analyses of the applicable" State constitutional provision). Judicial estoppel is applied to "defend the integrity of the judicial process by barring a party from taking contradictory positions during the course of litigation." <u>G-I Holdings, Inc. v. Reliance Ins. Co.</u>, 586 F.3d 247, 261 (3d Cir. 2009). Here, these Appellees are State actors, not members of any federal agency. Appellees cannot maintain a legal fiction that they lacked notice whether their conduct violated Fourth Amendment rights when they were duty-bound to obey the Supreme Court of Pennsylvania's Fourth Amendment decision in <u>Hicks</u>.

Whether estoppel applies or not, this Court agrees with the proposition accepted in other circuits, "In the absence of binding precedent, a court should look at all available decisional law including decisions of state courts, other circuits and district courts." <u>Hayes v. Long</u>, 72 F.3d 70, 73-34 (8th Cir. 1995), <u>cited with favor</u>

and followed in, Doe v. Delie, 257 F.3d 309, 321 n.10 (3d Cir. 2001); Tribble v. Gardner, 860 F.2d 321, 324 (9th Cir. 1988). Thus, Hicks can be considered on the merits of qualified immunity even though it was not a federal court.

### 3. Statute of Limitations is Not a Defense.

Appellees raised the two-year statute of limitations in their motions to dismiss. Boyer filed suit on July 27, 2023. He was arrested under 18 Pa.C.S. § 6108 on December 6, 2019 and October 19, 2021. [Second Am. Compl. ¶ 93]. The 2021 arrest is not time-barred. The 2019 arrest is properly raised for two reasons.

First, Boyer seeks injunctive relief, which is not subject to any statute of limitations, and he may plead all facts in support of that claim, including why he has standing by reason of "a credible threat" arising from past harms. Greenberg v. Lehocky, 81 F.4th 376, 385 (3d Cir. 2023). The "statute of limitations is a defense" but "not a rule of evidence," and therefore "has no bearing on the admissibility of evidence." Hankin Family P'ship v. Upper Merion Township, 2012 U.S. Dist. LEXIS 1471, at *37 (E.D. Pa. Jan. 5, 2012) (quotation omitted) (collective cases). Because Boyer filed suit before the statute of limitations had expired for the 2021 arrest, laches cannot be sought by the Appellees. Marchionni v. SEPTA, 2000 U.S. Dist. LEXIS 814, at *6 (E.D. Pa. Feb. 2, 2000) (citing Ivani Contracting Corp. v. City of New York, 103 F.2d 257, 260 (2d Cir. 1997)). Even so, there is no showing of prejudice to these Appellees where, as here, Boyer's firearms and property were

not returned until May 8, 2023 and his UFA license was denied on June 8, 2023.

[JA122-23 ¶¶ 89, 93]. Thus, Boyer promptly filed suit one month after all the continuing harms had come to fruition.

Second, Boyer alleges that Appellees re-filed the 2019 UFA charges on April 19, 2022, even though the Municipal Court had dismissed the same. By reinstituting legal process as of that date without probable cause, the statute of limitations re-accrued as of that date. On a "false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more." Wallace v. Kato, 549 U.S. 384, 390 (2007). If the Court disagrees, then only Appellees Marcus O'Shaughnessy, Lieutenant Long, and Frank T. Wallace would be dismissed from the case. Everyone else stays in.

**D. Appellees Violated and Continue to Violate Boyer's Second Amendment Right to Carry a Firearm to and from Courthouses and to Secure His Firearm within a Gun Locker while inside Courthouses.**

As a journalist and a private security guard for a hotel, Boyer has testified before the Philadelphia Court of Common Pleas ("Common Pleas") on numerous occasions, often in response to a subpoena, and believes and avers that he expects this to continue. Under Count 2, Boyer seeks injunctive and declaratory relief against the City, the Philadelphia District Attorney's Office, Lawrence Krasner, the Philadelphia Office of the Sheriff, and Sheriff Rochelle Bilal concerning their enforcement of 18 Pa.C.S. § 913 relative to the ability of unlicensed persons, like

Boyer, to surrender their firearms upon arriving at a court facility.

On October 19, 2021, Boyer appeared in Common Pleas to give testimony. When he arrived, he was wearing his security guard uniform, with a bulletproof vest and a holstered firearm on his person. Upon entering, Boyer made a request to a deputy sheriff for permission to deposit his firearm and equipment in the facility's gun locker and he was permitted to do so. After he finished testifying, Boyer retrieved his firearm and equipment to leave. But at that moment, Lt. O'Leary, a deputy sheriff, questioned whether Boyer had a UFA license. After Boyer produced his Lethal Weapons Act certification, O'Leary seized him and confiscated his firearm and equipment.

The allegations set forth clearly-defined and plausible claims for relief. The District Court erred in holding otherwise.

Boyer seeks injunctive relief in the nature of facial and as-applied challenges to the statute of 18 Pa.C.S. § 913 for failure to make provision for persons who open-carry a firearm, but lack a UFA license, to have the benefit of utilizing "lockers or similar facilities at no charge or cost for the temporary checking of firearms . . ." Id. § 913(e). As written, the statute permits these lockers or similar facilities for use only by persons who hold a UFA license or are exempt from licensure. Id. (citing 18 Pa.C.S. §§ 6106(b), 6109).

Boyer has standing to bring this claim. His past harm supports a credible threat

of future, recurring harm. <u>Greenberg v. Lehocky</u>, 81 F.4th 376, 385 (3d Cir. 2023). As a journalist with a focus on police misconduct, Boyer has been subpoenaed to testify before grand jury proceedings and can reasonably expect to be subpoenaed in the future.

Sheriff Bilal invoked the "sensitive places" doctrine articulated in <u>Bruen</u>, 597 U.S. at 30 (citing David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 203 (2018)), but this is nonresponsive. The Sensitive Places Doctrine applies to places like courthouse. But that does not address the practice of carrying a firearm for self-defense *while traveling to and from a courthouse*, and the statute of 18 <u>Pa.C.S.</u> § 913(e) already undertakes a process of allowing private persons to surrender their firearms to a deputy sheriff upon entering a court facility, but improperly restricts that to those who have a UFA license.

In <u>Koons v. Platkin</u>, 673 F. Supp. 3d 515 (D. N.J. 2023), <u>appeal filed</u>, No. 23-1900 (3d Cir. May 17, 2023), a New Jersey law was challenged under <u>Bruen</u> where it prohibited the carrying of firearms within a list of sensitive places and their adjacent parking lots, which included "an airport or public transportation hub." <u>Id.</u> at 595 (citing <u>N.J. Stat.</u> § 2C:58-4.6(a)(20)). The district court granted a preliminary injunction to the extent the law would apply to persons who are transporting to and from an airport or transportation hub. <u>Id.</u> The Sensitive Places Doctrine cannot be

enlarged to create a system where a person must "leave your Second Amendment rights and guns at home." Id. at 542. The Sensitive Places Doctrine does not extend to adjacent parking lots if there is no government security at those locations. Kopel & Greenlee, supra, at 290.

Thus, the statute of 18 Pa.C.S. § 913 does not permit the availability of gun lockers for a law-abiding person, who is unlicensed, to openly carry a firearm while traveling to and from a court facility. This violates Second Amendment protections under Bruen, because the government cannot force law-abiding persons to leave their firearms at home. It is a safer outcome for such persons to surrender their firearms to deputy sheriffs, for placement within a gun locker, than to leave firearms within a vehicle or with a third person outside the premises.

**E.    Appellees Violated and Continue to Violate Appellants' Due Process Rights by Depriving Them of Licensure under the Uniform Firearms Act and Private Detective Act without the Benefit of a Jury Trial.**

Under Counts 1 and 3, Boyer seeks injunctive relief against the District Attorney's Office under 42 U.S.C. § 1983 whether the Uniform Firearms Act and the Private Detective Act, on their face or as applied to the facts of the case, violate his constitutional rights by not affording a jury trial in the denial, revocation, suspension, or non-renewal of a license. [JA140-41 ¶¶ 161(c)-(d); JA145 ¶ 167(b)]. The structural feature of guaranteeing a jury trial is the strongest medicine against discrimination.

Here, we raised claims under the Due Process Clause of the Fourteenth Amendment and under the Sixth Amendment right to a jury trial, that depriving persons of core private rights, as well as the right of persons to engage in their chosen trade or profession, must proceed in courts of ordinary justice where jury trial is available. We therefore desire to test a novel theory, recognized by at least two justices of the U.S. Supreme Court in <u>Axon Enters. v. FTC</u>, 598 U.S. 175, 201-03 (2023) (Thomas, *J.*, concurring, joined by Gorsuch, *J.*) (citing PHILIP HAMBURGER, IS ADMINISTRATIVE LAW UNLAWFUL? (2014)). The original meaning of the Due Process Clause in the Fifth and Fourteenth amendments is a repudiation of the Star Chamber practices from the 17th Century. For due process claims, the U.S. Supreme Court has, like the Second Amendment, held that unenumerated rights of life, liberty, and property "must be 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" <u>Dobbs v. Jackson Women's Health Organization</u>, 597 U.S. 215, 231 (2022). That is a judicial inquiry "guided by the history and tradition" contemporaneous to the framing the Fourteenth Amendment of the U.S. Constitution, <u>id.</u> at 240, and such ordered liberty "sets limits and defines the boundary between competing interests." <u>Id.</u> at 255. Similarly, Sixth Amendment rights most be firmly rooted on the text and its "historical background" at the time of the Founding, <u>Crawford v. Washington</u>, 541 U.S. 36, 43 (2004).

Like <u>Bruen</u> as to the Second Amendment, <u>Crawford</u> as to the Sixth

Amendment, and <u>Dobbs</u> as to the Fourteenth Amendment, the Court must consider historical evidence at the time of the Founding. Professor Hamburger's research shows the public understanding of due process of law at the time of the Founding is embodied in the Acts of Parliament which repealed the Star Chamber and Court of High Commission.[11] PHILIP HAMBURGER, IS ADMINISTRATIVE LAW UNLAWFUL? 140-41 (2014) [JA663-64]. Parliament's repealing Act contained an extended Wherefore Clause which detailed legislative findings why Star Chamber violated "due Process of Law." 16 Charles I, c. 10, § 1 (1640) (emphasis and alterations added), <u>reprinted in</u>, 5 THE STATUTES OF THE REALM 110 [JA547-58]. Parliament found that Star Chamber violated due process because (1) it engaged in executive rulemaking; and (2) it engaged in administrative adjudications of private rights without a jury. <u>Id.</u> Both of these practices were "intolerable" to the people and created "an Arbitrary Power and Government." <u>Id.</u>

Consistent with Hamburger's scholarship, the Court has repeatedly held that constitutional rights are understood by juxtaposition with the oppressive practices by Star Chamber and the Court of High Commission. <u>E.g.</u>, <u>Timbs v. Indiana</u>, 586 U.S. 146, 159-64 (2019); <u>Marcus v. Search Warrant of Property</u>, 367 U.S. 717, 724-29 (1961). "This history was, of course, part of the intellectual matrix within which

---

[11] Although colloquially called a "Court," Star Chamber was part of the Executive Branch, where all judges were appointed by and loyal to the Crown. HAMBURGER, <u>supra</u>, at 147, 545-46 n.4 [JA669; JA679-80].

our own constitutional fabric was shaped." Id. at 729. The effect is that the right to jury trial is considerably broader under the Due Process Clause than the Seventh Amendment whenever *a government actor* is a party to the case working a deprivation of a fundamental right, whereas the Seventh Amendment guarantees jury trial in cases as between private parties.

From this historical research, the original meaning of due process has two categories of substantive content: First, as applied to adjudicating "core private rights," rather than public rights or governmental privileges within entitlement programs, the executive branch must proceed against a person only by commencing process through ordinary courts of justice, where their procedural protections and jury trials are available. Axon Enters., 598 U.S. at 202 (Thomas, *J.*, concurring, joined by Gorsuch, *J.*). Second, due process prohibits legislative delegation to executive rulemaking. Where both guarantees operate in tandem, "due process has always been the insistence that the executive—the branch of government that wields force against the people—deprive persons of rights only in accordance with settled rules independent of executive will," and through a court of ordinary justice. Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 YALE L.J. 1672, 1681 (2012).[12]

Where due process is derived from the Law of the Land Clause in Magna

---

[12] *Available at* https://www.yalelawjournal.org/pdf/1080_y4sioof3.pdf

Carta, _In re_ Winship, 397 U.S. 358, 379 (1970), early American caselaw followed the principle that due process requires private rights to be adjudicated in courts of ordinary justice where the jury trial is available.[13] "The meaning then of the term we are considering," that is _the constitutional law of the land_, "was that a man should not be deprived of his freehold, &c. but by the judgment of a court of justice regularly constated and authorized to decide what the law is, and to pronounce it in cases coming before them: which court shall ascertain facts by the verdict of a jury." University of North Carolina v. Foy, 5 N.C. (1 Mur.) 58, 74-75 (1805). Thus, "The term 'law of the land' had a precise legal meaning when used by the convention, and signified the lawful proceedings of the _proper tribunals_ of the country." Id. (emphasis in original).

Examining the practices of Star Chamber, Hamburger additionally observes that it engaged in occupational licensure, that is, licensing of newspapers. HAMBURGER, supra, at 56 [JA661]. These oppressive practices included the power to put people out of their chosen trade perpetually. That view is supported in the case of _In re_ Dorsey, 7 Port. 293 (Ala. 1838), which involved a challenge by an applicant for membership in the Alabama Bar and was obligated by statute to take a test oath whether he had engaged in the crime of dueling, even if unprosecuted. The majority

---

[13] Bowman v. Middleton, 1 S.C.L. (1 Bay) 252, 252 (1792); Lindsay v. Commissioners, 2 S.C.L. (2 Bay) 38, 59 (1796) (per Waties, _J._).

of the court agreed that the legislature could not disqualify individuals from their trade or profession by ascertaining unprosecuted criminal guilt by "a mode unknown to the common law, and forbidden by the bill of rights," rather than by a jury trial. Id. at 386. That "every one has the same right to aspire to office, or to pursue any avocation of business or pleasure, which cany other can" is a "general equality" that is "thus expressly asserted and guaranteed as one of the fundamental rights of each citizen . . ." Id. at 361. Early American caselaw therefore recognize that *excluding* persons from their chosen trade or profession must be adjudicated in courts of ordinary justice where jury trial is available.

Consistent with the Sixth Amendment, early English and American caselaw recognized that governmental action which works a perpetual exclusion of persons from their chosen occupation is *punitive* in nature, implicating jury trial to the same extent as a criminal prosecution. Excluding a person from their trade or profession was ***worse*** than a fine or imprisonment. Sir Edward Coke writes, "[A] mans trade is accounted his life, because it maintaineth his life; and therefore the monopolist that takes away a mans trade, taketh away his life," which in the eyes of the law is "odious." 3 EDWARD COKE, INSTITUTES OF THE LAWS OF ENGLAND, ch. 85, at 181 (1797 ed., London) (1644).[14]

---

[14] *Available at* https://archive.org/details/bim_eighteenth-century_the-third-part-of-the-in_coke-edward-sir_1797/page/n223/mode/2up

Coke defined "monopoly" broadly. It wasn't limited to exclusive trade privileges. It embraced any governmental action which "restrained" individuals or corporations "of any freedom, or liberty that they had before" in the "buying, selling, making, working, or using of any thing," or otherwise had "hindered [them] in their lawfull trade." Id. (alteration added). As such, "Generally all monopolies are against the great charter [Magna Carta], because they are against the liberty and freedom of the subject, and against the law of the land." 2 COKE, supra, ch. 29, at 47 (1642) (alteration added).[15] In the same way that Magna Carta prevented the Crown from seizing a person's property, "No man ought to be put from his livelihood without answer." Id. Coke and other English jurists had firmly developed these precedents before the ratification of the U.S. Constitution:

> [A]t the common law, no man could be prohibited from working in any lawful trade, for the law abhors idleness, the mother of all evil . . . especially in young men, who ought in their youth, (which is their seed time) to learn lawful sciences and trades, which are profitable to the commonwealth, and whereof they might reap the fruit in their old age, for idle in youth, poor in age; and therefore the common law abhors all monopolies, which prohibit any from working in any lawful trade.

The Case of the Tailors, 77 Eng. Rep. 1218, 1219 (1615).[16] While any person can be fined or even imprisoned for a criminal offense, permanently putting someone out of their trade or profession is more serious because "the party himself is rendered an

---

[15] *Available at* https://archive.org/details/bim_eighteenth-century_institutes-of-the-laws-_coke-sir-edward_1797/page/n71/mode/2up

[16] *Available at* https://www.commonlii.org/uk/cases/EngR/1572/418.pdf

useless member of the community." <u>Chesman ex ux. v. Nainby</u>, 93 Eng. Rep. 819, 821 (1727).[17] Consequently, private causes of action for damages are generally sufficient to protect members of the public from the harm "if a man will take upon him to use any trade, in which he hath no skill," <u>Allen v. Tooley</u>, 80 Eng. Rep. 1055, 1055 (K.B. 1614).[18]

Lawyers and judges in the early Republic followed the same principles as did Coke. In <u>State v. Johnston</u>, 2 H. & McH. 160 (1786), whether an applicant should be refused admission as a member of the Maryland Bar on account of being a loyalist during the Revolution, the court accepted Samuel Johnston's argument, "It is a rule in law, that penal statutes should be construed strictly, and surely such as deprive any person of the means of getting a livelihood for themselves and family by their honest industry, in the only way they know, must be penal indeed." <u>Id.</u> at 169.

In <u>Dorsey</u>, cited above, the justices of the Supreme Court of Alabama agreed that "a perpetual exclusion" from a person's chosen trade or profession is punitive. Justice Goldthwaite stated that whether "disqualification from office, or from the pursuit of a lawful avocation" is a punishment "is too evident to require any illustration," and agreed it was severe because he could not "devise any penalty" (other than say, capital punishment) "which would operate more forcibly on

---

[17] *Available at* https://www.commonlii.org/uk/cases/EngR/1795/791.pdf
[18] *Available at* https://www.commonlii.org/uk/cases/EngR/1792/687.pdf

society." <u>Dorsey</u>, 7 Port. at 366. It therefore violated the State constitutional right to a jury trial in criminal cases, being an analogue to the Sixth Amendment of the U.S. Constitution. <u>Id.</u> at 367-68.

> When once it is admitted or proved, that a citizen has the right to aspire to office, or to pursue any lawful avocation, it seems to me impossible that he can be legally deprived of this right, as a punishment for an offence committed, without a trial by jury; and I can perceive no sound distinction between a law which deprives one of his right without a trial, and that which ascertains and punishes his guilt by an illegal mode of trial.

<u>Id.</u> at 368.

Licensing systems are not unconstitutional per se, and there is nothing in the Due Process Clause that would prevent licensing authorities from investigating an applicant, including by way of standardized application and examination processes using objective criteria. There clearly is no deprivation in a constitutional sense whenever licenses are granted. It is only upon the refusal, non-renewal, suspension, or revocation of licenses that deprivation has occurred. Towards the end of the 19th Century the philosophy of Modernism, in the name of *efficiency*, began dispensing with jury trial over disputed questions of fact in individual cases over training, experience, education, and moral fitness. That is where constitutional rights to due process and jury trial are infringed. If jury trial attaches to perpetually excluding an individual from the legal profession, being highly regulated, as it did in <u>Dorsey</u>, it therefore attaches to any other trade or profession.

Finally, in <u>United States v. Smith</u>, 151 F. Supp. 2d 1316 (N.D. Okla. 2001), the court accepted the proposition that "a lifetime prohibition on the possession of a firearm is a serious penalty" which "entitles a Defendant to the common-sense judgment of a jury" under the Sixth Amendment. <u>Id.</u> at 1318. That reasoning applies with equal force where, as here, the Uniform Firearms Act works the same outcome. <u>Smith</u> was decided before <u>Heller</u>, <u>McDonald</u>, and <u>Bruen</u>, but it is consistent with <u>Bruen's</u> disapproval of the Appellate Review Model where the judiciary simply defers to the factfinding of the licensing authority. <u>Bruen</u>, 597 U.S. at 13. This "leaves applicants little recourse if their local licensing officer denies a permit." <u>Id.</u> The facts of this case bear that out where the City's Board of Licensing and Inspection Review became a Star Chamber for unprosecuted conduct.

Here, even though Boyer served for 13 years as a police officer, Krasner and the District Attorney's Office would reduce him into a useless member of the community by excluding him from his chosen profession as a private detective without the benefit of jury trial over disputed facts. Likewise, despite having no criminal convictions, a Lethal Weapons Act certification and more training than the average person, the City of Philadelphia would perpetually ban Boyer's fundamental right to keep and bear arms outside the home for self-defense. We don't deny the ability of society to set standards for one to join a chosen occupation or to screen for violent felony convictions before carrying a firearm concealed, but we assert that

society, sitting as a jury, should also be the judge of the facts in individual cases if government seeks to deprive us of it.

**F. Appellants have Standing to Raise Constitutional Challenges to the Private Detective Act on Its Face or As-Applied to the Facts.**

In Counts 3 and 4 of the Second Amended Complaint, Boyer and Pennsylvania S.I.T.E.S. Agents, LLC seek injunctive relief under 42 U.S.C. § 1983 relative to Fourteenth Amendment due process challenges involving the Private Detective Act and its enforcement. Count 5 raises related State law claims arising under the District Court's supplemental jurisdiction. The Due Process and Equal Protection clauses of the Fourteenth Amendment of the U.S. Constitution protect our fundament right to pursue any of the lawful professions, Dent v. West Virginia, 129 U.S. 114, 121-22 (1889), including occupational licensure. Schware v. Bd. of Bar Examiners, 353 U.S. 232, 238-39 (1957). "The right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." Truax v. Raich, 239 U.S. 33, 41 (1915) (affirming injunction against law that led employer to terminate employee).

To survive an Equal Protection or Due Process challenge, a law burdening entry into a profession must have a "rational connection with the applicant's fitness or capacity[.]" Schware, 353 U.S. at 239. Even when the law does not discriminate against a suspect class, "a State cannot exclude an applicant when there is no basis

for their finding that he fails to meet" standards for fitness or capacity, or where their action is invidiously discriminatory. Id. In other words, liberty to pursue a career "may not be interfered with, under the guise of protecting the public interest," by governmental action "which is arbitrary or without reasonable relation to some purpose within the competency of the State to effect." Meyer v. Nebraska, 262 U.S. 390, 399-400 (1923).

And when reviewing a statute for rationality or legitimate state interest, courts insist on "knowing the relation between the classification adopted and the object to be obtained." Doe v. Bd. of Prob. & Parole, 513 F.3d 95, 107-08 (3d Cir. 2008).

### 1. The Patrolman Exception and the Application of Collateral Estoppel.

In 2016, Boyer filed an application in the Philadelphia Court of Common Pleas for a license under the Private Detective Act. At the time he filed, he had 13 years of experience as a police officer in the Philadelphia Police Department. His work experience involved investigative work and training in undercover and surveillance operations as to illegal trafficking in narcotics. Boyer had experience enforcing misdemeanor vices (e.g., Theft) and Vehicle Code offenses (e.g., Driving Under the Influence). The nature of his work as a police officer met the statutory criteria for investigating "[c]rimes or wrongs done or threatened" against the Commonwealth, the "identity, habits, conduct, movements, whereabouts, affiliations, associations, transactions, reputation, or character" of any person or

persons, the "credibility of witnesses or other persons," the "location or recovery of lost or stolen property," the "causes and origin of or responsibility for, fires . . . or losses, or accidents, or damage, or injuries, to real or personal property," and the "securing of evidence to be used" in the trial of civil or criminal cases. 22 P.S. § 12(b)(1). [JA114-15 ¶¶ 40; JA126 ¶¶ 104-05].

When an evidentiary hearing was held in Common Pleas, the District Attorney's Office opposed the application at the instigation of the Philadelphia Police Department and for the purpose of retaliating against Boyer. The DA's Office invoked the so-called "Patrolman Exception" in the Act, which reads in pertinent part that applicants must have been "regularly employed as a detective, or shall have been a member of the United States government investigative service, a sheriff, a member of the Pennsylvania State Police, *or a member of a city police department of a rank or grade higher than that of patrolman*, for a period of not less than three years." 22 P.S. § 14(a) (emphasis added). The DA's Office erroneously asserted that, because Boyer did not hold a rank higher than patrolman, he was *per se* unqualified. In so doing, the DA's Office "purposefully misstated the law and ignored controlling authority" under the Act. [JA123-25 ¶¶ 102-03; JA127 ¶ 109]. In particular, the DA's Office ignored the Supreme Court of Pennsylvania's decision in the case of *In re Sentry Secur., Inc.*, 417 A.2d 190, 194 (Pa. 1980), which construed this provision and held that Common Pleas must follow "a functional analysis," by disregarding

the job title of the officer and looking instead whether the nature of the work correlates to "the duties performed by a private detective" as described in the Act.

Boyer avers that he is qualified under the Act and desires to apply again for a license. But he is chilled in pursuing a new application because of the behavior of the DA's Office as applied to constantly invoking the Patrolman Exception and the collateral estoppel doctrine, which violate his fundamental right to follow a chosen profession free from unreasonable governmental interference. Boyer avers that the DA's Office has a history of discriminatory enforcement where political insiders, having the same rank as Patrolman, were granted licenses. Additionally, we appended to our pleading the job description for the City's "Police Officer 1," the entry-level grade for political officers, which Appellees equate as "Patrolman." The position by definition has the same responsibilities required by the Private Detective Act as shown in Chart 2 in the Appendix at JA538-39. As such, any enforcement of the Patrolman Exception serves no purpose than to engage in discrimination and confusion of the factfinder.

In Count 3, Boyer seeks injunctive relief against enforcement of the Patrolman Exception in 22 P.S. § 14(a) either on its face or as-applied. The Patrolman Exception fails even rational basis review. Boyer alleges that the Police Officer 1 position "fairly describes the responsibilities associated with Boyer's employment with the Philadelphia Police Department." As applied to the Philadelphia Police

Department, the entry-level Police Officer 1 position by definition performs all of the responsibilities required by a "private detective business" under 22 P.S. 12(b) of the PDA. For Krasner and the Philadelphia District Attorney's Office to constantly invoke the Patrolman Exception in opposition to any PDA application by Boyer, or former Philadelphia police officers like him, serves no rational purpose than to discriminate for the purpose restricting competition or for retaliatory purposes.

"Courts have repeatedly recognized that protecting a discrete interest group from economic competition is not a legitimate governmental purpose." Craigmiles v. Giles, 312 F.3d 220, 224 (6th Cir. 2002). Where a licensure statute is weaponized to shield a trade or profession from competition, it comes "close to striking us with the force of a five-week old, unrefrigerated dead fish." Id. at 225 (quotation omitted). This discrimination against city police officers comes without a rational relationship to the fitness or capacity to perform the essential duties of a private detective. See Schware, 353 U.S. at 239.

Likewise, Boyer challenges the application of the collateral estoppel doctrine and seeks to enjoin Krasner and the DA's Office from invoking it more than two years after his first PDA application was denied. Here, the PDA does not define when a new application can be filed, as we saw in the Uniform Firearms Act. See, e.g., 18 Pa.C.S. § 6114 ("A judgment sustaining a refusal to grant a license shall not bar, after one year, a new application[.]"). Where the initial term of a license under

the PDA is two-years, 22 P.S. § 16(a), Boyer maintains there is no rational basis to extend collateral estoppel beyond two years after July 15, 2016—the date Common Pleas denied his first application.

As a matter of rational basis review, a "lifetime ban" from one's chosen trade or profession violates constitutional due process even under the deferential rational basis review. Nixon v. Dep't of Pub. Welfare, 839 A.2d 277, 399 (Pa. 2003) (citing Meyer v. Nebraska, 262 U.S. 390, 399 (1923)).

Here, if Boyer prevails on his claim to invalidate the Patrolman Exception, as argued above, then that creates an intervening change in the legal context of the PDA, warranting a new determination since that was the very ground on which he lost his original application. "A state may not grant preclusive effect in its own courts to a constitutionally infirm judgment[.]" Kremer v. Chemical Construction Corp., 456 U.S. 461, 482 (1982). Preclusion doctrines should not apply where the plaintiff did not have a "full and fair" opportunity to litigate the claims. Id. at 480-81.

Boyer has stated a plausible claim.

## 2.    Lack of Fair Warning.

After having lost his first attempt to obtain a license under the Private Detective Act, in 2019 Andre Boyer organized a limited liability company, Pennsylvania S.I.T.E.S. Agents, LLC (the "LLC"). Boyer is the sole member of the LLC. Under Boyer's business model, the LLC operates a website that advertises

private detective services, but any leads for investigative work generated from the LLC are referred out to licensed private detectives under a fee-splitting arrangement where the licensed private detective solely performs the requested service without any control by Boyer. Also, any leads for bodyguard services generated from the LLC are performed by Boyer, himself. Chilled at the prospect of being criminally prosecuted — yet again, by the same persons who came after him repeatedly under the UFA — Boyer formed an agreement with a licensed private detective where the latter will operate the LLC and Boyer ceased all operations of his website during the pendency of the suit, but desires to resume operations. Boyer's rights have been chilled.

Under Count 4 of the Second Amended Complaint, Appellants seek injunctive and declaratory relief against particular enforcement of the Private Detective Act. Among the grounds is the fact that the regulated activity is defined under a presumption of non-exhaustive "include," 22 P.S. § 12(b), but the Act does not provide any procedures for a cease-and-desist order as a condition-precedent to any criminal prosecution for violating the PDA.

Appellants believe and aver that they are under an objective threat of prosecution under the PDA because (1) whether the LLC advertises its services "to be that of detective, or of a detective agency, or investigator, or watch, guard or patrol agency," 22 P.S. § 13(a), and (2) whether every "group of persons" must be

licensed, even if one of the parties is already licensed, 22 P.S. § 14. After commencing suit in the District Court, the Philadelphia District Attorney's Office took the position that Boyer "illegally operates a security business without a private detective license."

The PDA imposes criminal liability as a third-degree misdemeanor on any person who engages "in a private detective business without a license," 22 P.S. § 26.1. Third-degree misdemeanors are authorized for a term of imprisonment not exceeding one year, 18 Pa.C.S. § 1104(3), and fines not exceeding $2,500.00. Id. § 1101(6). By imposing criminal penalties, this statutory structure creates the familiar problem of fair warning as a matter of constitutional due process which "bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." United States v. Lanier, 520 U.S. 259, 266-67 (1997) (citations and internal quotations deleted). "In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Id. That is clearly applicable here: due process prevents the courts from applying novel applications of the PDA. The legislature can comply with this constitutional mandate by imposing a cease-and-desist order requirement by the enforcing agency, which in this case is the district attorneys' offices across the Commonwealth, as a condition-precedent to any

criminal prosecution. That way, the person receiving the cease-and-desist order can immediately comply and then seek declaratory relief in a court of competent jurisdiction whether their activity is subject to licensure under the PDA or not.

There is also an equal protection clause problem presented by the PDA. Under the Fourteenth Amendment, "all persons similarly circumstanced shall be treated alike." Plyler v. Doe, 457 U.S. 202, 216 (1982) (quotation omitted). Here, the legislature saw fit to impose cease-and-desist order requirements on broadly-stated statutes regulating other trades and professions, including licensure, but the private detective profession is not equally protected. The Cancer Law, for instance, requires the Pennsylvania Department of Health to issue a cease-and-desist order on any person from engaging in any preparation, device or diagnostic procedures for diagnosing, treating, mitigating, or curing cancer, whether by use of drugs, surgery or radiation treatment, if the Secretary determines the same are "not efficacious." 35 P.S. § 5604. If a person violates the order, it is a criminal misdemeanor for a first offense. Id. § 5606(a). This structure regulates novel cancer treatments and protects the interests of cancer patients, but the activity is otherwise undertaken by bona fide, law-abiding service-providers. It meets the fair warning requirement so that oncologists, pharmaceutical companies, or drug-device manufacturers do not find themselves a subject of criminal prosecution for engaging in an otherwise lawful trade or profession.

Cease-and-desist orders are ubiquitous in other statutes regulating trades and professions, particularly in connection with licensure or broadly-stated activities. See, e.g., 40 P.S. § 626.3(a) (Viatical Settlements Act); 40 P.S. § 3201 (Continuing-Care Provider Registration and Disclosure Act); 52 P.S. § 681.5a (Anthracite Strip Mining and Conservation Act); 52 P.S. § 1396.4c (Surface Mining Conservation and Reclamation Act). Significantly, like the PDA, some of these licensed activities are also defined through the non-exhaustive "include." E.g., 52 P.S. § 1396.3 (defining "surface mining activities" as "including, but not limited to" enumerated conduct).

The cease-and-desist order requirement protects law-abiding persons from becoming criminally prosecuted simply for working in their chosen trade or profession. It furthers the due process requirement for a fair warning, as articulated in Lanier, and provides an opportunity for regulated persons to test the scope of licensure by seeking the declaratory judgment remedy if they receive a cease-and-desist order, in lieu of defending a criminal prosecution. It is contrary to due process to force persons to become criminally prosecuted in order to receive fair warning whether their otherwise lawful business activities were a subject of licensure. It is contrary to the equal protection of the laws where the Pennsylvania General Assembly has extended the cease-and-desist order requirement for the benefit of other licensed trades and professions, where the licensed activity is defined non-exhaustively, but has excluded the private detective profession from the benefit of

such laws where the licensed activity is similarly non-exhaustive. The outcome should not depend on whether some industries or interest groups are more talented at lobbying the legislature. Similarly situated persons must be treated the same.

Based on the foregoing, Appellants stated plausible claims for relief under the *Twombly/Iqbal* framework. Reversal is warranted.

### G. The District Court Erred in Dismissing Philadelphia Lodge No. 5, Fraternal Order of Police, "With Prejudice."

Philadelphia Lodge No. 5, Fraternal Order of Police, filed a motion to dismiss on the basis of the statute of limitations. Section 1983 borrows from State law the defense of statute of limitations and its exceptions. Manuel v. City of Joliet, 580 U.S. 357, 370 (2017). We do not challenge the merits of the dismissal except where the District Court's Order granted the dismissal "with prejudice." The order below should be vacated with instructions that the dismissal is "without prejudice."

Dismissal with prejudice requires a showing of futility. Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000). For that reason, "a plaintiff's failure to plead facts that would prevent a dismissal on statute of limitations grounds does not typically warrant dismissal with prejudice." Garcia v. Chiquita Brands Int'l, Inc., 48 F.4th 1202, 1220 (11th Cir. 2022). Dismissals without prejudice are appropriate because of the possibility of tolling and exceptions to the time-bar, id., which include (1) the discovery exception and (2) fraudulent concealment. See, e.g., Fine v. Checcio, 870 A.2d 850, 858 (Pa. 2005) (discovery exception); Aquilino v. City of Philadelphia

Cath. Archdiocese, 884 A.2d 1269, 1278 (Pa.Super. 2005) (fraudulent concealment).

Neither is there futility here: "The pleading requirements in the Federal Rules of Civil Procedure, however, do not compel a litigant to anticipate potential affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such defenses." Abbas v. Dixon, 480 F.3d 636, 640 (2d Cir. 2007). As such, Rule 12 motions to dismiss based on affirmative defenses, like statute of limitations, are granted *without* prejudice.

This Court does not "uphold a dismissal with prejudice where the plaintiff had been given no opportunity to amend its complaint and would not have been given an opportunity to amend in the future." United States ex rel. Customs Fraud Investigators, LLC v. Victaulic Co., 839 F.3d 242, 252 (3d Cir. 2016). Here, we amended our complaint, not based on the District Court's comments, but on resolving proper parties. The Amended Complaint added Pennsylvania S.I.T.E.S. Agents, LLC as a plaintiff, and the Second Amended Complaint removed then Pennsylvania Attorney General Michelle A. Henry and then State Police Commissioner Christopher L. Paris as parties. We were not given any opportunity to amend relative to curing technical deficiencies based on the District Court's comments.

Where the Second Amended Complaint details the involvement of FOP Lodge No. 5 in launching retaliation against Boyer for attending a trial and seeking

to have his UFA license revoked based on perjury in 2016, there are enough facts here to show that FOP Lodge No. 5 is a bad actor and discovery is likely to show further involvement that isn't stale. Therefore, dismissal "with prejudice" should be vacated with instructions that FOP Lodge No. 5 be dismissed "without prejudice." Discovery may show facts supporting an exception to the time-bar or tolling.

### H. The Balance of Appellees' Boilerplate Affirmative Defenses Should have been Denied.

Where the Section 1983 claims are well-pled, there were not defects in the tag-along State tort claims for malicious prosecution (Count 10), trespass to chattels (Count 12), assault and battery (Count 13), and false imprisonment (Count 14) based on the same operative facts.

Appellees invoked the Political Subdivision Tort Claims Act, 42 Pa.C.S. §§ 8541-46. That is no defense to Section 1983 and, as to the Pennsylvania tort claims, the Act exempts from immunity any municipal employee who engaged in "actual malice or willful misconduct," 42 Pa.C.S. § 8550, and the latter includes "intentional tort." Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994). Appellants' intentional torts come within that exemption. DiSalvio v. Lower Merion Sch. Dist., 158 F. Supp. 2d 553, 562 (E.D. Pa. 2001) (assault and battery); Hayes v. City of Philadelphia, 2005 U.S. Dist. LEXIS 27916, at *24 (E.D. Pa. Nov. 14, 2005) (malicious prosecution); Copenhaver v. Borough of Bernville, 2003 U.S. Dist. LEXIS 1315, at *5-6 (E.D. Pa. Jan. 9, 2003) (trespass to chattel). An essential

element of civil conspiracy is malice, i.e., an intent to injure, <u>Skipworth ex rel.</u> <u>Williams v. Lead Indus. Ass'n</u>, 690 A.2d 169, 174 (Pa. 1997), and therefore it is also exempt under the statute. <u>Schlichter v. Limerick Township</u>, 2005 U.S. Dist. LEXIS 7287, at *33-34 (E.D. Pa. Apr. 26, 2005).

For qualified immunity, it is not a defense to the counts where injunctive relief is sought. <u>Hill</u>, 455 F.3d at 244. For the claims raising damages, this Court "does not require relatively strict factual identity between applicable precedent and the case at issue. [S]ome but not precise factual correspondence to precedent would be required." <u>Stoneking v. Bradford Area Sch. Dist.</u>, 882 F.2d 720, 726 (3d Cir. 1989). For the Second Amendment claims, <u>Heller</u> established in 2008 that the Second Amendment is a personal right to self-defense and not limited to militia service. <u>McDonald</u> established in 2010 that the Second Amendment is incorporated against the States. <u>Bruen</u>, on the other hand, went no further than to say what the "Second Amendment's ***plain text***" had presumptively guaranteed. <u>Bruen</u>, 597 U.S. at 33 (emphasis added). From the "central component" of self-defense, the Court reasoned that "confrontation can surely take place outside the home." <u>Bruen</u>, 597 U.S. at 33. As a matter of ordinary human experience, "Most gun owners do not wear a holstered pistol at their hip in their bedroom or while sitting at the dinner table." <u>Id.</u> For purposes of qualified immunity, Appellees' assertion that they needed a court to expressly tell them what the plain text of the Second Amendment already told them

is frivolous. Once incorporated under <u>McDonald</u> in 2010, their notice was complete based on the plain text of the Second Amendment.

Finally, where <u>Bruen</u> was decided on June 23, 2022, none of the Appellees acted promptly to discontinue the harm they had caused, such as dismissing the criminal charges and returning Boyer's property. Therefore, Appellees remain liable after June 23, 2022 for "the failure to discontinue" the harm. <u>Pinsky</u>, 79 F.3d at 313.

For the affirmative defense of privilege to the State tort claims, Pennsylvania follows the same standard "by analogy to good faith qualified immunity in federal claims," <u>Dorsey v. Redman</u>, 96 A.3d 332, 344 (Pa. 2014); <u>Boettger v. Miklich</u>, 599 A.2d 713, 720 (Pa. Commw. Ct. 1991), <u>rev'd on other grounds</u>, 633 A.2d 1146 (Pa. 1993). The defense therefore fails for all the same reasons. Moreover, on a Rule 12(b)(6) motion, the averments in our pleadings that the Appellees acted with malicious intent are treated as facts. They can't defend on the pleadings stage that they had pure hearts and empty minds.

## VIII.  CONCLUSION AND RELIEF REQUESTED.

**WHEREFORE**, for all the reasons set forth above, Appellants request the following relief:

(1)     Reverse the District Court's order filed September 24, 2024, which granted motions to dismiss in favor of the Appellees, and remand for further proceedings;

(2)     Vacate the portion of the same order while dismissed Philadelphia Lodge No.

5, Fraternal Order of Police with prejudice, and remand with instructions that dismissal be had without prejudice.

(3)     Retain jurisdiction to award costs for the appeal, including reasonable attorneys' fees if the Court determines that the common benefits doctrine applies, McBride v. Int'l Longshoremen Ass'n, 778 F.3d 453, 459 (3d Cir. 2015), or Appellant was the "prevailing party" within 42 U.S.C. § 1988 by reason of prevailing on his cross-motion for summary judgment.

(4)     AND such other relief as the Court deems necessary, just, or appropriate.

Respectfully submitted,

**CORNERSTONE LAW FIRM, LLC**

Dated: March 3, 2025          By:     /s/ Joel A. Ready
                                      Joel A. Ready, Esquire
                                      Attorney I.D. #321966
                                      8500 Allentown Pike, Suite 3
                                      Blandon, PA 19510
                                      (610) 926-7875

# COMBINED CERTIFICATIONS

I, the undersigned, hereby certify the following:

(1)    That I am a member of the Bar of the United States Court of Appeals for the Third Circuit.

(2)    This document <u>exceeds</u> the type-volume limit of Fed. R. App. P. 32 because it contains <u>23,826</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). A motion for relief from the type-volume limitation will be filed.

(3)    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

(4)    That the text of the electronic and paper versions of the foregoing brief are identical.

(5)    On <u>March 3, 2025</u>, I caused a virus check to be performed on the Appellant's Opening Brief using Windows Security Antivirus Version 1.423.167.0 (Antimalware Client Version 4.18.24090.11) and that no virus was detected.

(6)    That, on <u>March 3, 2025</u>, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

**CORNERSTONE LAW FIRM, LLC**

Dated: March 3, 2025      By:    /s/ Joel A. Ready

Joel A. Ready, Esquire
Attorney I.D. #321966
8500 Allentown Pike, Suite 3
Blandon, PA 19510
(610) 926-7875